# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ALEXIS D. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:20-cv-00885-NR |
| | ) | |
| v. | ) | |
| | ) | |
| PG PUBLISHING COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
## <u>DEFENDANT'S MOTION TO DISMISS</u>

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

ARGUMENT .......................................................................................................................... 6

I.      THE COMPLAINT CONTAINS NO PLAUSIBLE ALLEGATIONS OF
DISCRIMINATION OR RETALIATION UNDER SECTION 1981 ............................... 7

      A.      The Complaint Does Not Plausibly Allege Race-Based Discrimination ............... 7

            1.      The Complaint Fails to Allege Impairment of a Contractual Right ........... 7

            2.      The Complaint Fails to Allege Adverse Employment Action ................... 9

            3.      The Complaint Fails to Allege Discrimination as a "But For" Cause of
Ms. Johnson's Asserted Injury ................................................................ 10

      B.      The Complaint Does Not Plausibly Allege Retaliation ....................................... 11

            1.      The Complaint Fails to Allege Protected Activity ................................... 12

            2.      The Complaint Fails to Allege Adverse Action or Causation Linked to
Protected Activity ................................................................................... 13

II.     THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE
GRANTED BECAUSE THE FIRST AMENDMENT BARS LIABILITY FOR THE
POST-GAZETTE'S EXERCISE OF EDITORIAL JUDGMENT ................................. 15

      A.      Making Story Assignments is the Exercise of Basic Editorial Judgment ............. 15

      B.      The First Amendment to the United States Constitution and Article I, § 7 of
the Pennsylvania Constitution Bar Ms. Johnson's Claims ................................. 17

CONCLUSION ..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ampersand Publ'g LLC v. NLRB,*
    702 F.3d 51 (D.C. Cir. 2012) ............................................................................8, 19

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...........................................................................................6, 10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................................6

*Boy Scouts of Am. v. Dale,*
    530 U.S. 640 (2000) ...............................................................................................20

*Caplan v. L Brands/Victoria's Secret Stores, LLC,*
    210 F. Supp. 3d 744 (W.D. Pa. 2016) ....................................................................13

*CBOCS West, Inc. v. Humphries,*
    553 U.S. 442 (2008) ...............................................................................................12

*Claybrooks v. American Broadcasting Cos., Inc.,*
    898 F. Supp. 2d 986 (M.D. Tenn. 2012) ..........................................................19, 20

*Comcast Corp. v. National Ass'n of African American-Owned Media,*
    140 S. Ct. 1009 (2020) ...............................................................................8, 9, 10, 11

*Coutu v. Martin Cty. Bd. of Comm'rs,*
    47 F.3d 1068 (11th Cir. 1995) ...............................................................................14

*Curay-Cramer v. Ursuline Academy of Wilmington, Del., Inc.,*
    450 F.3d 130 (3d Cir. 2006) ...................................................................................12

*Domino's Pizza, Inc. v. McDonald,*
    546 U.S. 470 (2006) .............................................................................................7, 8

*Donald J. Trump for President, Inc. v. Boockvar,*
    2020 WL 4920952 (W.D. Pa. Aug. 23, 2020) ........................................................5

*Ellis v. Budget Maintenance, Inc.,*
    25 F. Supp. 3d 749 (E.D. Pa. 2014) .................................................................11, 12

*Estate of Oliva ex rel. McHugh v. New Jersey,*
    604 F.3d 788 (3d Cir. 2010) .............................................................................11, 12

*Estate of Roman v. City of Newark*,
914 F.3d 789 (3d Cir. 2019)...............................................................................3, 5

*Fitzgerald v. Haynes*,
241 F.2d 417 (3d Cir. 1957)...................................................................................5

*Gogel v. Kia Motors Mfg. of Ga., Inc.*,
967 F.3d 1121 (11th Cir. 2020) ...........................................................................14

*Gonzalez v. Potter*,
2010 WL 2196287 (W.D. Pa. 2010) .......................................................................9

*Heritage Valley Health Sys., Inc. v. Nuance Commc'ns, Inc.*,
2020 WL 4700842 (W.D. Pa. Aug. 13, 2020) ........................................................3

*Hosanna-Tabor Evangelical Lutheran Church & Sch.* v. *EEOC*,
565 U.S. 171 (2012)..............................................................................................20

*Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*,
515 U.S. 557 (1995).........................................................................2, 17, 19, 20

*Jones v. SEPTA*,
796 F.3d 323 (3d Cir. 2015).....................................................................................9

*Kavowras v. N.Y. Times Co.*,
328 F.3d 50 (2d Cir. 2003).....................................................................................5

*Langley v. Merck & Co.*,
186 F. App'x 258 (3d Cir. 2006) .............................................................................9

*Lewis v. Univ. of Pitts.*,
725 F.2d 910 (3d Cir. 1983)...................................................................................11

*Mariotti v. Mariotti Bldg. Prods., Inc.*,
714 F.3d 761 (3d Cir. 2013)....................................................................................6

*McDermott v. Ampersand Publ'g LLC*,
593 F.3d 950 (9th Cir. 2010) .................................................................................17

*Miami Herald Publ'g Co. v. Tornillo*,
418 U.S. 241 (1974)..........................................................................................17, 20

*Moore v. City of Phila.*,
461 F.3d 331 (3d Cir. 2006)...................................................................................11

*Newspaper Guild of Greater Phila., Local No. 10 v. NLRB*,
636 F.2d 550 (D.C. Cir. 1980) .........................................................................10, 18

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
140 S. Ct. 2049 (2020) .................................................................................................20

*Passaic Daily News v. NLRB*,
736 F.2d 1543 (D.C. Cir. 1984) ...............................................................................8, 19

*Redgrave v. Boston Symphony Orchestra, Inc.*,
855 F.2d 888 (1st Cir. 1988) ........................................................................................20

*Reynolds v. Department of Army*,
439 F. App'x 150 (3d Cir. 2011) ....................................................................................9

*Sarullo v. U.S. Postal Serv.*,
352 F.3d 789 (3d Cir. 2003).............................................................................................9

*Schurr v. Resorts Int'l Hotel, Inc.*,
196 F.3d 486 (3d Cir. 1999)............................................................................................9

*Storey v. Burns Int'l Sec. Servs.*,
390 F.3d 760 (3d Cir. 2004)............................................................................................9

*Sutton v. Chanceford Twp.*,
186 F. Supp. 3d 342 (M.D. Pa. 2016) ...........................................................................17

*Telescope Media Group v. Lucero*,
936 F.3d 740 (8th Cir. 2019) ..................................................................................19, 20

*U.S. v. Davis*,
2020 WL 4193021 (E.D. Pa. July 21, 2020)...................................................................2

*Wormack v. Shinski*,
2010 WL 4052189 (W.D. Pa. 2010) ...............................................................................9

**State Cases**

*Nelson v. McClatchy Newspapers, Inc.*,
936 P.2d 1123 (Wash. 1997)....................................................................................17, 18

*Penn. Bur. of Prof'l & Occupational Affairs v. State Bd. of Phys. Therapy*,
556 Pa. 268 (Pa. 1999) .................................................................................................17

**Administrative Cases**

*PG Publ'g Co. d/b/a Pitts. Post-Gazette*,
368 NLRB No. 41 (Aug. 22, 2019) .................................................................................5

**Constitutional Provisions**

Penn. Const. art. I, § 7 ...............................................................................15, 16, 17, 20

U.S. Const. amend I ................................................................................................ *passim*

**Federal Statutes**

42 U.S.C. § 1981.................................................................................................... *passim*

42 U.S.C. § 1981(a) ..................................................................................................1, 7

**Rules**

Fed. R. Civ. P. 12(b)(6)...............................................................................................19

## INTRODUCTION

This case arises from allegations that, one day in June, Alexis Johnson didn't get story assignments she pitched to her editors at the Pittsburgh Post-Gazette.  Ms. Johnson, a reporter employed by the Post-Gazette, asked to report on issues related to protests of the George Floyd killing after she had posted a sarcastic tweet to express her personal opinions about the issue.  The editors, applying established canons of journalism that news reporters should not be commentators, did not assign Ms. Johnson the stories she requested that day.  She called the decision racist (Ms. Johnson is African American); the editors called it sound journalism.  The issue got messier when the union representing Post-Gazette workers urged members to re-post the tweet in an effort to "prove" discrimination if the newspaper permitted non-minority reporters to continue covering the protests despite such social media activity.  But the Post-Gazette responded by applying the same professional standards to all its staff members equally without regard to race.

Ms. Johnson filed the instant Complaint, as later amended (Dkt. 17) ("Compl."), against PG Publishing Company, publisher of the Post-Gazette, alleging racial discrimination and retaliation in violation of the Civil Rights Act of 1866, which guarantees the right of all citizens to make and enforce contracts, regardless of race.  42 U.S.C. § 1981(a).  Her Complaint should be dismissed because the facts alleged do not assert a plausible claim for discrimination or retaliation under § 1981.  It does not allege impairment of any contractual right – as reporters have no entitlement to dictate the stories they cover – or any adverse employment action, as Ms. Johnson was not disciplined, penalized, or subjected to any loss in pay.  And it fails to allege discrimination was the "but for" cause of her asserted injury.  Nor does the Complaint plausibly allege retaliation.  The cause of action sounding in retaliation is predicated upon the very same allegations as the claim of discrimination, and fails to allege Ms. Johnson engaged in *any* statutorily protected activity – let alone activity which subjected her to a subsequent adverse employment action.

1

But the problems of this lawsuit are more fundamental than just a defective Complaint. Ms. Johnson alleges that applying the standards of professional journalism to her constitutes discrimination, and asks this Court to (among other things) compel the Post-Gazette to assign her to protest-related stories of her choice notwithstanding her public commentary on the issues. Such a demand represents unprecedented intrusion into the Post-Gazette's editorial decisionmaking and its policies in support of journalistic integrity. A newspaper's decision on what stories to cover, which reporters to assign, and how those stories are to be edited, are matters of editorial judgment protected by the free press provisions of the United States and Pennsylvania Constitutions. The Supreme Court has made clear these First Amendment guarantees have "no more certain antithesis" than to allow government to intrude on editorial decisions, even where the state's asserted goal is to enforce anti-discrimination statutes. *Hurley v. Irish-Am. Gay, Lesbian, & Bisexual Grp. of Boston*, 515 U.S. 557, 578-79 (1995). Ms. Johnson's claims are entirely foreclosed by these constitutional safeguards, and should be dismissed with prejudice.

## BACKGROUND

On Saturday afternoon, May 30, 2020, a peaceful protest in downtown Pittsburgh organized to mourn the death of George Floyd and to seek racial justice led to unrest and violence, resulting in property damage, including the burning of police cars, and a number of arrests.[1] More than 60 businesses were damaged, and two KDKA-TV journalists were seriously injured when protesters stomped and kicked them, and destroyed their camera. By the end of the day,

---

[1] Compl. ¶¶ 10-12, 14; https://pittsburghpa.gov/publicsafety/blotterview/671; https://pittsburghpa.gov/publicsafety/blotterview/675. The online "police blotter" maintained by the City of Pittsburgh is properly the subject of judicial notice. *See*, *e.g.*, *U.S. v. Davis*, 2020 WL 4193021, at *1 n.2 (E.D. Pa. July 21, 2020).

Pennsylvania Governor Tom Wolf issued an emergency disaster declaration in response to violent clashes in Pittsburgh, Harrisburg, and Philadelphia.[2]

The next day, Ms. Johnson used her Twitter account to express her opinions about the destruction.  Her tweet likened the damage caused by the rioters with litter left in parking lots by attendees at a country music show.[3]  It contained photographs of trash-littered parking lots and made light of the widespread destruction in downtown Pittsburgh:



*See* Ex. A at 1.  Although the tweet was posted on Johnson's personal Twitter account, it identified her by name, listed the Post-Gazette as her employer, and specified her social media beat as a reporter for the Post-Gazette.

---

[2]   *Gov. Wolf: Commonwealth Response Coordination Center Activated in Response to Riots*, May 30, 2020 (https://www.governor.pa.gov/newsroom/gov-wolf-commonwealth-response-coor-dination-center-activated-in-response-to-protests/).  The press release from the Governor's web-site is judicially noticeable.  *See, e.g.*, *Heritage Valley Health Sys., Inc. v. Nuance Commc'ns, Inc.*, 2020 WL 4700842, at *4 (W.D. Pa. Aug. 13, 2020).  *See also TIMELINE: 60 businesses reporting damage in downtown following Saturday riots*, WPIX.com, May 31, 2020 (https://www.wpxi.com/news/local/allegheny-county/timeline-44-people-arrested-during-looting-rioting-following-peaceful-protest/VIUHYBVPJJHW3B6R2XFOZVTDOY); *KDKA cameraman and reporter injured at protest*, PBRTV.com, May 30, 2020 (https://www.pbrtv.com/kdka-cameraman-injured-at-protest/).

[3]   Compl. ¶¶ 13-15.  A copy of Ms. Johnson's tweet and the resulting Twitter thread is attached at Exhibits A and B.  The tweet and thread are properly attached because Plaintiff incorporates them into her Complaint by reference.  *See, e.g.*, *Estate of Roman v. City of Newark*, 914 F.3d 789, 796-97 (3d Cir. 2019).

According to her Complaint, Ms. Johnson intended the tweet as commentary objecting to racial bias she perceived in connection with property damage and personal harm.  Compl. ¶ 13. Specifically, she sought to "ridicule[] the idea that protesters in general and specifically African American protesters seeking racial justice were destructive looters," *id*. ¶ 15, and to "mock, ridicule and protest discrimination against African Americans by society in general and by whites who equate property damage with human life."  *Id*. ¶ 17.  Her stated purpose was "to mock and ridicule, and thus to protest, the racial bias and discrimination in a society that condemns African Americans who oppose racial injustice by protests that result in some property damage, while tolerates [*sic*] similar property damage by predominately white crowds[.]"  *Id.* ¶ 16.

The tweet went viral (being re-tweeted by a large number of Twitter users) and sparked significant debate on the comment thread, some of it quite heated.  *See generally* Ex. A.  Some commentators passionately supported Ms. Johnson's tweet; others opposed it with equal vigor.  *Id*. Ms. Johnson participated in the back-and-forth, tweeting in response to one comment: "It's 'just trash and beer cans' that the city has to clean up and people leave behind because of a concert and not because people are outraged with systematic racism and police brutality.  Your privilege is showing."  Ex. B.  Editors at the Post-Gazette became aware of Ms. Johnson's tweet the day it was posted, as well as the ensuing debate.  Compl. ¶¶ 19, 21-22.

Ms. Johnson had not previously been assigned demonstration-related stories, as her usual "beat" is to cover stories arising on or relating to social media platforms.  *Id.* ¶¶ 2, 4-6.  On June 1, 2020, however, the morning after her Twitter activity on the issue, she pitched several protest-related story ideas to her editor.  *Id*. ¶¶ 19-20; *cf. id*. ¶¶ 5-6.  Ms. Johnson met with Post-Gazette Managing Editor Karen Kane and two other editors later that day to discuss her request.  *Id*. ¶ 19. The editors expressed concern that Ms. Johnson had taken public positions on issues the newspaper

4

`was covering, given that, pursuant to standard journalistic practice and the Post-Gazette's editorial policy, reporters should not opine on an issue and then report on it. *Id.* ¶¶ 19, 21-22.[4]  Ms. Kane thus told Ms. Johnson she could not be assigned to protest coverage that day because of the general understanding that reporters should not cover events about which they had publicly expressed opinions. *Id.* ¶¶ 21-23.  Although Ms. Johnson did not get the story assignments she requested, there is no allegation she was disciplined, suffered any wage loss, or was subjected to any action affecting her position or title at the paper.

The union that represents Post-Gazette employees, the Newspaper Guild of Pittsburgh, Local 38061 ("Guild"), publicized the paper's decision with respect to Johnson, characterizing it as racially motivated.[5]  Subsequently, dozens of other Guild-member journalists employed by the Post-Gazette reposted Johnson's tweet on their own social media accounts. Compl. ¶ 25.  Though this was an apparent attempt to force the Post-Gazette to allow journalists to simultaneously comment on and report the protests, its response was to apply the rules of professional journalism to each of the 80 Guild members who reposted the tweet in precisely the same manner in which it applied them to Ms. Johnson.  Compl. ¶¶ 28, 29; *see also* Ex. C.  The Post-Gazette only assigned

---

[4]  Though not identified in the Complaint by name, the other two editors were City Editor Tim McDonough and Deputy Managing Editor for Digital News Matt Kennedy.

[5]  *See Keith C. Burris: Truth, fairness and the Pittsburgh Post-Gazette*, Pittsburgh Post-Gazette, June 10, 2020 (https://www.post-gazette.com/local/region/2020/06/10/Truth-fairness-Pittsburgh-Post-Gazette-burris-george-floyd/stories/202006090137) (copy attached as Exhibit C). This "published report" by the Post-Gazette's then-Executive Editor (who is also Vice President of Block Communications, Inc., Defendant's parent company), *see* Compl. ¶ 29, is properly attached and cited because the Complaint incorporates it by reference.  *See Estate of Roman*, 914 F.3d at 796-97; *Donald J. Trump for President, Inc. v. Boockvar*, 2020 WL 4920952, at *7 (W.D. Pa. Aug. 23, 2020).  The paper and the Guild remain in long-running negotiations over their collective bargaining agreement.  *See PG Publ'g Co. d/b/a Pitts. Post-Gazette*, 368 NLRB No. 41 (Aug. 22, 2019); *cf. Fitzgerald v. Haynes*, 241 F.2d 417, 418 (3d Cir. 1957) (judicial notice of NLRB proceeding); *accord Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 57 (2d Cir. 2003).

staff members to protest coverage who were not expressing personal opinions on social media about the events then taking place.  *See id.* ¶ 30; Ex. C.  All Post-Gazette staff members who took a public position on matters covered by the paper by reposting Johnson's tweet were subject to the same rules.  As with Ms. Johnson, there is no allegation these reporters were subject to any wage loss or other adverse economic or position/title consequences.

Thus, the essential facts of this case as set forth in the Amended Complaint are these:  (1) Ms. Johnson injected her opinion into a public debate concerning a significant controversy and then asked to be assigned to cover the same events as a reporter; (2) Post-Gazette editors declined to assign Ms. Johnson to protest coverage that day because of journalistic standards that avoid the perception that the newspaper mixes commentary with news coverage; (3) the same policy applied to all Post-Gazette staff members who reposted the Johnson tweet; and (4)  no one was disciplined, demoted, or financially sanctioned as a result of these events.

## ARGUMENT

Ms. Johnson's Amended Complaint fails to plead either a factual or legal basis for relief under 42 U.S.C. § 1981, and must be dismissed, even taking all of its factual allegations as true (which they are not).  *Mariotti v. Mariotti Bldg. Prods., Inc.*, 714 F.3d 761, 764-65 (3d Cir. 2013).  To survive a motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  And it must plead both factual allegations and a legal basis that "plausibly suggest[s] an entitlement to relief."  *Id*. at 681.  In this regard, a complaint that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  *Id*. at 678 (quoting *Twombly*, 550 U.S. at 555).

The claims of racial discrimination and retaliation in Ms. Johnson's Complaint boil down to this:  The Pittsburgh Post-Gazette declined to assign her to stories she pitched on June 1, 2020,

after she engaged in public commentary on the subject matter she wanted to cover, and that other Post-Gazette journalists who expressed support by reposting her Tweet were treated the same way. On their face, these allegations do not state a cause of action under 42 U.S.C. § 1981, and, even if they did, the Complaint must be dismissed because the requested relief would invade the Post-Gazette's editorial control of its newspaper as guaranteed by the First Amendment.

**I.     THE COMPLAINT CONTAINS NO PLAUSIBLE ALLEGATIONS OF DISCRIMINATION OR RETALIATION UNDER SECTION 1981**

**A.     The Complaint Does Not Plausibly Allege Race-Based Discrimination**

The Complaint fails to allege that Defendant denied Plaintiff a contractual right on the basis of her race which resulted in an adverse employment action.  Dismissal of the discrimination claim under 42 U.S.C. § 1981(a) is thus proper.

**1.     The Complaint Fails to Allege Impairment of a Contractual Right**

The Complaint asserts that "preclud[ing] and remov[ing] Johnson, from covering major stories involving race-based protests and demonstrations" deprived her "of the same right to make and enforce contracts as is enjoyed by white citizens" in violation of § 1981.  Compl. ¶ 42.  This statement of the claim relies upon two flawed premises:  first, that white journalists similarly situated to Ms. Johnson have a contractual right to unilaterally decide the stories they cover; and second, that Ms. Johnson was deprived of that right due to her race when, on June 1, 2020, the Post-Gazette's Managing Editor rejected her proposal to cover stories on which she had expressed a public opinion.  *Id*. ¶¶ 20-22.  As the Complaint does not, and cannot, plausibly allege impairment of a contractual right – as no reporter, regardless of race, has a right to receive story assignments of their choosing – Count Two must be dismissed.

Any § 1981 claim must identify an impaired contractual relationship "under which the plaintiff has rights," *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).  That is, § 1981

establishes a "right to enforce established contract obligations." *Id*. at 477.  Plaintiff cannot state a § 1981 claim unless she "has (or would have) rights under the existing (or proposed) contract that [s]he wishes 'to make and enforce.'" *Id*. at 479-80.  Even read most favorably to Ms. Johnson, the Complaint fails to identify any contractual right she had to override the Post-Gazette's editorial decisions about which stories editors assign to reporters.  That the Complaint fails to do so is unremarkable, given the federal labor law rule that issues of what is published, or not, are generally not a "legitimate employee concern," but rather it is the "*publisher*—not a reporter—[that has] absolute authority to shape a newspaper's content." *Ampersand Publ'g LLC v. NLRB*, 702 F.3d 51, 56 (D.C. Cir. 2012); *Passaic Daily News v. NLRB*, 736 F.2d 1543, 1557-58 (D.C. Cir. 1984).  The Complaint does not allege plausibly the existence of any contractual right – let alone one denied to Ms. Johnson because of her race, rather than due to her tweets.

On the contrary, the Complaint alleges the Post-Gazette assigned stories in accord with established journalistic standards, regardless of employee race, as evidenced by its preclusion of all journalists who expressed opinions about the protests online from covering stories about those protests.  This past Term, in *Comcast Corp. v. National Ass'n of African American-Owned Media*, 140 S. Ct. 1009 (2020), the Supreme Court observed in the context of a § 1981 claim that:  "[i]f the defendant would have responded the same way to the plaintiff even if he had been white, an ordinary speaker of English would say that the plaintiff received the 'same' legally protected right as a white person." *Id*. at 1015.  Here, the Complaint alleges that the factor upon which the Post-Gazette relied to not assign staff members to coverage of the public debate over the George Floyd protests was their social media activity – *not* their race.  That is, the Post-Gazette's ethical rules barred them by from acting simultaneously as commentators on a story and reporters of the news. Compl. ¶¶ 28-29.  Plaintiff's acknowledgment of this application of basic ethical rules to all staff,

regardless of race, compels dismissal. *Comcast*, 140 S. Ct. at 1015. In short, failure to allege Ms. Johnson had a contractual right to choose her assignments, or that she was denied that right because of race, means the § 1981 claim of discrimination fails at the threshold.

### 2.      The Complaint Fails to Allege Adverse Employment Action

The Complaint fails to allege adverse employment action, as § 1981 requires, for similar reasons. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *Langley v. Merck & Co.*, 186 F. App'x 258, 260-61 (3d Cir. 2006). To survive dismissal, a complaint must allege "action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (citation and internal quotation marks omitted).[6] Ms. Johnson may well have been upset she did not get the story assignments she sought on June 1, but "not everything that makes an employee unhappy constitutes an adverse employment action." *Wormack v. Shinski*, 2010 WL 4052189, *4 (W.D. Pa. 2010); *Gonzalez v. Potter,* 2010 WL 2196287 (W.D. Pa. 2010).

Under this element, even suspension with pay is not adverse employment action. *Jones v. SEPTA*, 796 F.3d 323, 326-27 (3d Cir. 2015) (suspension is not a "serious and tangible" alteration of "terms, conditions, or privileges of employment"). Likewise, placing an employee on a performance improvement program, *Reynolds v. Department of Army*, 439 F. App'x 150, 153-54 (3d Cir. 2011), or imposing a lateral transfer are not adverse employment actions. *Langley*, 186 F. App'x at 260-61 ("Minor action, such as lateral transfers and changes of title and reporting relationships, are generally insufficient to constitute adverse employment actions.").

---

[6] In the Third Circuit, the standards for adverse employment action are identical under Title VII and § 1981. *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 499 (3d Cir. 1999); *Langley*, 186 F. App'x at 259, 260 n.2.

The Complaint does not allege the Post-Gazette transferred Ms. Johnson, suspended her without pay, or otherwise altered *any* terms, conditions or privileges of her employment. It instead pleads precisely the sort of "formulaic recitation of the elements of a cause of action" that the Supreme Court has held insufficient, alleging only that "[p]recluding and removing Johnson from covering a major story is a materially adverse action." Compl. ¶ 34; *Iqbal*, 556 U.S., at 678. The Complaint thus fails to state a claim of discrimination under § 1981.

There is also no plausible allegation Ms. Johnson was "removed" from covering anything, as the Complaint acknowledges she had not previously been assigned work outside her social media "beat." *Id.* ¶¶ 5-6, 19-20. Her only claim is she was not given assignments she requested on June 1, after she engaged in public commentary on the protests, which, as noted, the Complaint does not (and cannot) allege is a contractual right owed Ms. Johnson (or any other reporter). Imposing standards to prevent reporters from covering stories about which they have injected opinions into public debate is not an "adverse employment action" – it is ethical journalism. *Newspaper Guild of Greater Phila., Local No. 10 v. NLRB*, 636 F.2d 550, 555 (D.C. Cir. 1980). As the Complaint is devoid of factual allegations that the Post-Gazette took these steps in an effort to deprive Ms. Johnson of contractual rights because of her race, she has not asserted a plausible claim of discrimination under § 1981.

### 3.    The Complaint Fails to Allege Discrimination as a "But For" Cause of Ms. Johnson's Asserted Injury

Even if a reporter's failure to get preferred assignments could be an adverse employment action, the Complaint fails to allege racial discrimination was the "but for" cause of the Post-Gazette's action. In *Comcast*, the Supreme Court held unanimously that for a § 1981 claim to lie, a plaintiff "must initially plead and ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast*, 140 S. Ct. at 1019. The Court upheld

10

dismissal of a claim based on allegations that a cable operator disfavored programming services owned by African Americans and for that reason refused to enter contracts.  It held a complaint fails to plausibly allege a § 1981 violation if it identifies race as a "motivating factor" for the defendant's actions rather than as the "but-for" cause of those actions.  *Id*. at 1017-19.  Under *Comcast*, Ms. Johnson's Complaint fails on its face for not alleging race was the "but for" cause of her purported injury, and instead alleging it only as a "motivating factor."  Compl. ¶¶ 25-26.

Notably, Ms. Johnson's initial Complaint failed to allege race was even a *motivating* factor in the Post-Gazette's decisionmaking.  Her Amended Complaint adds a bald assertion that "the race of reporters … was a motivating factor" in the decisions, Compl. ¶ 25, and tries to support that claim with a brief quip attributed to the Managing Editor.  *Id*. ¶ 26 ("I guess I can't now do anything to Black people!  I have to pick better targets.").  While the Post-Gazette disputes this as pure fabrication, it does not matter for purposes of ruling on this motion.  Even taking all allegations as true (including this one), such assertions fall short of alleging race as the "but for" cause of the alleged discrimination, as *Comcast* requires.  *Comcast*, 140 S. Ct. at 1019.  *See also Lewis v. Univ. of Pitts.*, 725 F.2d 910 (3d Cir. 1983).

### B.    The Complaint Does Not Plausibly Allege Retaliation

The Complaint also fails to assert a plausible claim of retaliation.  Pleading a retaliation claim under § 1981 requires alleging (1) protected activity, either participation or opposition, (2) adverse action, and (3) causal connection between the protected activity and adverse action.  *Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006).  The Third Circuit also requires, as a prerequisite, an underlying § 1981 violation.  *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010) ("In a retaliation case a plaintiff must demonstrate that there had been an underlying section 1981 violation."); *Ellis v. Budget Maintenance, Inc*., 25 F. Supp. 3d 749, 757 (E.D. Pa. 2014) ("*Oliva* is the controlling authority in this circuit.").  Applying these elements,

Ms. Johnson's Complaint fails at the threshold.  For reasons already set forth, it does not allege a plausible claim of discrimination under § 1981, *see supra* 7-11, which also compels dismissal of the retaliation claim under *Oliva*.  604 F.3d at 798; *Ellis*, 25 F. Supp. 3d at 755.

Even if the Court were inclined to look beyond *Oliva* (which it need not), a retaliation claim arises when an employer punishes an employee for engaging in protected activity.  Yet the Complaint's cause of action sounding in retaliation relies on the same set of allegations for the discrimination claim, and does not provide an independent basis for retaliation.  Compl. ¶¶ 36-39.[7]

### 1. The Complaint Fails to Allege Protected Activity

A § 1981 retaliation claim seeks to protect those, like whistleblowers, who are punished for complaining about discriminatory acts perpetrated against others.  *See*, *e.g.*, *Oliva*, 604 F.3d at 798.  To constitute protected activity, a plaintiff's actions must be undertaken to vindicate an express statutory right – in this case, formation and enforcement of contracts under § 1981, regardless of race.  *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 452 (2008).  Because that is not what is alleged here, the Complaint fails to state a cause of action sounding in retaliation.

The Third Circuit illustrated this point in *Curay-Cramer v. Ursuline Academy of Wilmington, Delaware, Inc.*, 450 F.3d 130 (3d Cir. 2006).  A teacher employed by a private Catholic school argued she had engaged in protected activity when she made a public announcement supporting the decision in *Roe v. Wade*.  The Court rejected that argument, noting, "we are not aware of any court that has found public protests or expressions of belief to be protected conduct absent some perceptible connection to the employer's alleged illegal employment practice[.]"  *Id*. at 135.  While

---

[7]   The Complaint purports to assert a claim of retaliation on behalf of "others" who were precluded from covering stories, Compl. ¶ 36, but Ms. Johnson has commenced this action in her individual capacity and not as a representative of any other employee.  Out of an abundance of caution, however, the Post-Gazette sets forth herein why neither Ms. Johnson nor any of those "others" have a plausible claim of retaliation.

*Curay-Cramer* arose in the context of Title VII, that same analysis has been applied to reject an employee's claim that race-related social media posts unrelated to the vindication of a statutory right to form and enforce contracts constitute protected activity under § 1981, noting that "[a]n 'oblique reference' to or 'mere mention of race' or race-based discrimination does not constitute protected opposition to violations of § 1981." *Caplan v. L Brands/Victoria's Secret Stores, LLC*, 210 F. Supp. 3d 744, 754 (W.D. Pa. 2016), *aff'd*, 704 F. App'x 152 (3d Cir. 2017).

The Complaint asserts that Ms. Johnson and other Post-Gazette employees protested discrimination in society at large by posting and re-tweeting her tweet. Compl. ¶¶ 28-29, 36-38. However, these tweets concerning the state of society in general are not "opposition" to any asserted unlawful employment practice by the Post-Gazette, or to any specific instance of a race-based deprivation of a contractual right. Such conduct is therefore not protected activity.

>        2.      **The Complaint Fails to Allege Adverse Action or Causation Linked to Protected Activity**

As with her discrimination claim, Ms. Johnson fails to allege adverse employment action beyond decisions about assignment of stories when she and other Post-Gazette staffers tweeted. Even if declining to assign stories to reporters who publicly make their views known about the subject matter of the stories could suffice to "dissuade a reasonable news reporter from making or supporting claims of race discrimination," Compl. ¶ 34, such a response by the Post-Gazette was warranted in light of the manner in which Ms. Johnson and others expressed themselves.

As news professionals, Ms. Johnson and other Post-Gazette staffers had a duty to conduct themselves in accord with journalistic standards. They accordingly knew or should have known their public tweets had the potential to compromise the public's perception of the Post-Gazette's journalistic integrity, and that they would be unable to cover the subject matter of the tweets. In fact, the Post-Gazette staffers' re-publication of Ms. Johnson's initial tweet came at the Guild's

urging in an effort to force the Post-Gazette to either assign stories in violation of journalistic standards or refrain from reporting the news. *See supra* 5-6; Ex. C.

Especially to the extent the tweets were bad-faith attempts to force the Post-Gazette to compromise its journalistic integrity in this way, conduct which prevents an employee from meeting workplace expectations concerning professional standards does not constitute protected activity. According to the Equal Employment Opportunity Commission: "Opposition to perceived discrimination … does not serve as license for the employee to neglect job duties. If an employee's protests render the employee ineffective in the job, the retaliation provisions do not immunize the employee from appropriate discipline or discharge."[8] The Court should not countenance Ms. Johnson's attempts to transform the consequences of her and her colleagues' failure to observe professional journalistic standards into a claim of retaliation.

The Complaint acknowledges the handling of story assignments sought to prevent mixing commentary with reporting, to preserve journalistic credibility. Compl. ¶¶ 19, 21-22. Where, as here, an employee's purported protected activity so conflicts with performance of job duties as to render her ineffective in that position, the conduct loses the protections extended under statutory anti-retaliation provisions. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121 (11th Cir. 2020). As set forth in the Post-Gazette's published report (referenced in the Complaint), the purported "retaliation" entailed application of a "longstanding canon of journalism ethics: When you announce an opinion about a person or story you are reporting on you compromise your reporting." Ex. C. The Guild tried to exploit the situation by urging members to repost the tweet, assuming

---

[8]   EEOC Enforcement Guidance on Retaliation and Other Issues (Aug. 25, 2016), www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues#_ftnref53 (citing *Coutu v. Martin Cty. Bd. of Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995)).

the Post-Gazette would treat white reporters differently, but it responded by applying the same journalistic standards to all staff members, regardless of race.

It should have come as no surprise to Ms. Johnson – or any other professional journalist – that publicly tweeting opinions about newsworthy events could affect their ability to report on them.  Efforts to rely on the Post-Gazette's application of these standards to Ms. Johnson's and her colleagues' conduct to assert a retaliation claim is misplaced.  The Amended Complaint thus does not plausibly allege a claim of retaliation, and should be dismissed.

## II.   THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED BECAUSE THE FIRST AMENDMENT BARS LIABILITY FOR THE POST-GAZETTE'S EXERCISE OF EDITORIAL JUDGMENT

Ms. Johnson's Complaint is nothing more than a dispute about the Post-Gazette's exercise of editorial judgment.  While her claims come dressed in the trappings of a civil rights suit, this is not a cause of action for which relief can be granted under the First Amendment to the United States Constitution or article I, § 7 of the Pennsylvania Constitution.

### A.   Making Story Assignments is the Exercise of Basic Editorial Judgment

Decisions about what stories should be covered, who writes them, and how they are edited constitute the essence of editorial judgment and are governed by journalistic standards.  In this connection, one established norm of the profession is that reporters should not engage in public commentary on issues they cover.  As the Post-Gazette's then Executive Editor wrote (in an article incorporated by reference in the Complaint), the decisions that resulted in this lawsuit were made "for purely journalistic reasons" and the journalistic standards that were applied are part of a "long-held tradition at this newspaper and at every good newspaper."  Ex. C.  There can be no serious dispute about this.  Rules to avoid real or perceived bias in reporting have long been adopted by

professional journalism organizations,[9] and major news outlets.[10]  They appear in the Post-Gazette's editorial policies,[11] and apply to reporters' use of social media.

Ms. Johnson straightforwardly acknowledges her Complaint is an attack on the Post-Gazette's exercise of editorial judgment.  Indeed, it is about nothing else.  It alleges the Post-Gazette "precluded and removed Johnson … from covering major stories involving race based protests and demonstrations."  Compl. ¶ 36; *see also id*. ¶¶ 37-39.  And it admits Post-Gazette editors did not assign the stories Ms. Johnson pitched on June 1 because she "offered an opinion opposing" "racism and the murder of black people at the hands of police," *id*. 21, that "her tweet showed she could not cover the protests fairly," *id*. ¶ 19, and that "commenting on a matter in the news would preclude a reporter or journalist from thereafter covering that story."  *Id*. ¶ 22.  Thus, all agree that this case is about the Post-Gazette's exercise of editorial judgment; Ms. Johnson simply wants this Court to order the newspaper to alter its editorial policies.

---

[9]  *See* Soc'y of Prof'l Journalists ("SPJ") Code of Ethics (https://www.spj.org/pdf/spj-code-of-ethics.pdf); Bill Kovach and Tom Rosenstiel, THE ELEMENTS OF JOURNALISM 143 (Three Rivers Press, 3d ed., 2014) ("One might imagine that one could both report on events and be a participant " but "being a participant clouds all the other tasks a journalist must perform.").

[10]  *See, e.g.*, *N.Y. Times Social Media Guidelines for the Newsroom* (www.nytimes.com/editorial-standards/social-media-guidelines.html); *Wash. Post Policies & Standards* (www.washingtonpost.com/news/ask-the-post/wp/2016/01/01/policies-and-standards); Social Media Guidelines for Associated Press Employees (www.ap.org/assets/documents/social-media-guidelines_tcm28-9832.pdf) ("AP employees must refrain from declaring their views on contentious public issues in any public forum and must not take part in organized action in support of causes or movements.").

[11]  *See* Post-Gazette Social Media Guidelines (March 2018) ("Sharing your personal opinions as well as expressing partisan political views, whether on a personal social media platform or otherwise, might open the employer up to criticism that you are biased and therefore could make you ineligible to cover that particular topic in the future.  Be mindful of the integrity, reputation and credibility of the Post-Gazette.") (attached as Exhibit D).

**B.      The First Amendment to the United States Constitution and Article I, § 7 of the Pennsylvania Constitution Bar Ms. Johnson's Claims**

Once it is clear what this case is about, its outcome is obvious.  The Supreme Court held unanimously that "[t]he Speech Clause has no more certain antithesis" than to allow government to intrude on editorial decisions, even where the state seeks to enforce antidiscrimination statutes where "the ultimate point of forbidding … discrimination toward certain classes is to produce a society free of the corresponding biases."  *Hurley*, 515 U.S. at 578-79.  The Court held the First Amendment barred Massachusetts from applying' its public accommodation law to require the private organizers of Boston's St. Patrick's Day parade to include a gay contingent.  In reaching this conclusion, the Court drew on precedent upholding the rights of newspaper publishers, citing *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974).  *Hurley*, 515 U.S. at 575, 579.[12]

*Tornillo*, another unanimous ruling of the Court, made clear that:

> The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

418 U.S. at 258.  In this regard, the First Amendment protects a publisher's choice of which writers to assign to cover stories.  *McDermott v. Ampersand Publ'g LLC*, 593 F.3d 950, 962 (9th Cir. 2010) ("To the extent the publisher's choice of writers affects the expressive content of its newspaper, the First Amendment protects that choice."); *Nelson v. McClatchy Newspapers, Inc.*, 936 P.2d 1123, 1131 (Wash. 1997) (*en banc*) ("Editorial integrity and credibility are core

---

[12]  These same rules apply under the Pennsylvania Constitution.  *See*, *e.g*., *Sutton v. Chanceford Twp.*, 186 F. Supp. 3d 342, 350 (M.D. Pa. 2016) ("Article I, § 7 … affords greater protection to expressive conduct than the United States Constitution's First Amendment."); *Penn. Bur. of Prof'l & Occupational Affairs v. State Bd. of Phys. Therapy*, 556 Pa. 268, 275 (Pa. 1999) (same).

objectives of editorial control and thus merit protection under the free press clauses" of the First Amendment; as such, statutes prohibiting discrimination based on employee's political positions must yield to news organization's First Amendment right to control assignment of reporters).

The holding in *McClatchy Newspapers* is particularly apt.  The Washington Supreme Court surveyed First Amendment decisions and found "[c]ase law unambiguously allows a news publication to follow a code designed to limit conflicts of interest which may diminish publication credibility."  *Id*. at 1133.  The court observed that the editorial policies at issue were "nearly identical to those employed by the Associated Press, *The Washington Post,* and the Society of Professional Journalists," and that "[f]reedom of the press leaves such decisions to the press, not the legislature or the courts."  *Id*.

*Newspaper Guild of Greater Philadelphia* is similarly on point, in holding labor law could not be applied to regulate a newspaper's Code of Ethics (based on what is now the SPJ Code) "to spell out [its] standards of integrity, objectivity, and fairness, and to protect and enhance its quality and credibility."  636 F.2d at 555.  The court held that, while the National Labor Relations Act required the paper to collectively bargain over aspects of the Code affecting employment conditions, the First Amendment barred regulation that intrudes on editorial judgment.  *Id*. at 558.

The court agreed "that protection of the editorial integrity of a newspaper lies at the core of publishing control," that "credibility is central to their ultimate product and to the conduct of the enterprise" and as such, "editorial control and the ability to shield that control from outside influences are within the First Amendment's zone of protection and … entitled to special consideration."  *Id*. at 560.  The court thus concluded that "a news publication must be free to establish without interference, reasonable rules designed to prevent its employees from engaging in activities which may directly compromise their standing as responsible journalists and that of the

publication for which they work as a medium of integrity."  *Id*. at 561.  "Where enforcement of the Act would interfere with a newspaper publisher's 'absolute discretion to determine the contents of [its] newspaper[ ],' the statute must yield."  *Ampersand Publ'g*, 702 F.3d at 56 (quoting *Passaic Daily News*, 736 F.2d at 1557-58).

These bedrock principles apply notwithstanding Ms. Johnson's use of § 1981 as a vehicle for her claims.  The court in *Claybrooks v. American Broadcasting Companies, Inc.*, 898 F. Supp. 2d 986, 993-96 (M.D. Tenn. 2012), applied these basic First Amendment rules and dismissed with prejudice a § 1981 claim alleging that casting decisions for the television programs *The Bachelor* and *The Bachelorette* were motivated by racial discrimination.  For purposes of the motion, the court applied Rule 12(b)(6) and assumed all allegations were true, *i.e.*, that "defendants *did* discriminate on the basis of race."  *Id*. at 997.  It nevertheless held the claims were barred as a matter of law because, under *Hurley*, "anti-discrimination statutes of general applicability must yield to the First Amendment."  *Id*. at 996.  The court compared casting decisions by television producers with editorial and creative choices by newspaper editors, playwrights, or parade sponsors (as in *Hurley*) and held them to be constitutionally protected.  *Id*. at 1000.  It noted:

> [T]he First Amendment protects the defendants' ability to control the content of their own programs unilaterally.  Thus, whether applying § 1981 here would actually enhance the Shows' expressive content, contradict that content, or not affect it all is essentially beside the point, because the defendants—not the plaintiffs—are entitled to control the casting of their own programs in the manner in which they see fit.

*Id*. at 997 n.13.  This general principle means "the First Amendment can trump the application of antidiscrimination laws to protected speech."  *Id*. at 993.

The Eighth Circuit reached the same conclusion in *Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019), holding the First Amendment barred the Minnesota Human Rights Act from requiring a videographer to record same-sex marriages.  The court observed that "[e]ven

antidiscrimination laws, as critically important as they are, must yield to the Constitution.  And as compelling as the interest in preventing discriminatory conduct may be, speech is treated differently under the First Amendment." *Id*. at 755 (citing *Hurley*, 515 U.S. at 579); *id*. at 754 (citing *Tornillo*, 418 U.S. at 256).  *See also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 659 (2000) ("[T]he First Amendment prohibits the State from imposing [an inclusion] requirement through the application of its public accommodations law.").  Importantly, no proposed remedy could be fashioned that would survive constituitonal scrutiny, as it would involve courts in oppressing the editorial process. *See Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888 (1st Cir. 1988) (*en banc*) (Massachusetts Civil Rights Act could not be enforced to require the Boston Symphony Orchestra to stage a performance of Stravinsky's *Oedipus Rex* or pay damages for non-performance).

The Supreme Court reached the same conclusion under the First Amendment's religion clauses.  It has held, for example, that they bar application of employment discrimination statutes to a religious institution's selection of ministers, *Hosanna-Tabor Evangelical Lutheran Church & Sch.* v. *EEOC*, 565 U.S. 171 (2012), and recently reaffirmed and expanded on this in *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020), with respect to religious schools' selection of teachers.  As the Court explained, religious institutions may be subject to secular laws, but not for "internal management decisions that are essential to [their] central mission." *Id*. at 2060.  Under the First Amendment, laws, even those of general application, can no more regulate editorial choices of how news editors assign reporters than it can tell churches what ministers to hire. *Claybrooks*, 898 F. Supp. 2d at 996; *Tornillo*, 418 U.S. at 258.  Under these well-established precedents, there is no possible basis for this Court to award the relief Ms. Johnson seeks.

## CONCLUSION

For the reasons above, Defendant respectfully asks the Court to dismiss the Complaint with prejudice.

20

Respectfully Submitted,

PG PUBLISHING COMPANY

By its attorneys,

/s/     *Robert Corn-Revere*
        Robert Corn-Revere

Robert Corn-Revere (*pro hac vice*)
Ronald London (*pro hac vice*)
Courtney T. DeThomas (*pro hac vice*)
**DAVIS WRIGHT TREMAINE LLP**
1301 K Street NW, Suite 500 East
Washington D.C. 20005
202-973-4200
bobcornrevere@dwt.com
ronnielondon@dwt.com
courtneydethomas@dwt.com

Patrick K. Cavanaugh
**DEL SOLE CAVANAUGH STROYD LLC**
Three PPG Place, Suite 600
Pittsburgh, PA 15222
412-261-2395 (phone)
pcavanaugh@dscslaw.com

Dated: October 16, 2020