IN THE UNITED STATES DISTRICT COURT
                         OF WESTERN PENNSYLVANIA


ALEXIS D. JOHNSON,                      CIVIL DIVISION

            Plaintiff,                  No. 20-00885

        vs.

PG PUBLISHING COMPANY,

            Defendant.
- - - - - - - - - - - - - - -
BLOCK COMMUNICATIONS, INC., PG          No. 20-1222
PUBLISHING COMPANY,

            Plaintiffs,

        vs.

PITTSBURGH COMMISSION ON HUMAN
RELATIONS,

              Defendant.

        Transcript of VIDEOCONFERENCE ORAL ARGUMENT
                 held on FEBRUARY 11, 2021
   United States District Court, Pittsburgh, Pennsylvania
   BEFORE:  HONORABLE J. NICHOLAS RANJAN, DISTRICT JUDGE

APPEARANCES:

For the Alexis Johnson:      Samuel J. Cordes, Esq.

For PG Publishing Company:   Robert Corn-Revere, Esq.
                             Zachary N. Gordon, Esq.
                             Ronald Gary London, Esq.


For Pittsburgh Commission:   Lawrence D. Kerr, Esq.
                             Wendy Kobee, Esq.
                             Michael E. Kennedy, Esq.


Court Reporter:              Karen M. Earley, RDR-CRR
                             412-201-2660


Proceedings reported by mechanical stenography.
Transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S
 2    (February 11, 2021, 10:00 a.m.)
 3              THE DEPUTY CLERK:  Good morning.
 4              The United States District Court for the
 5    Western District of Pennsylvania is now in session.  The
 6    Honorable J. Nicholas Ranjan presiding.
 7              The matters now before the Court are Alexis D.
 8    Johnson vs. PG Publishing Company at Case No. 20-cv-885
 9    and PG Publishing Company, et al., versus Pittsburgh
10    Commission on Human Relations at Case No. 20-cv-1222.
11              THE COURT:  All right.  Good morning,
12    everyone.
13              Why don't we start by entering appearances for
14    the record beginning with the Johnson case.  Who do we
15    have for the plaintiff?
16              MR. CORDES:  Samuel Cordes, Your Honor.
17              THE COURT:  All right.  Great.  Good morning.
18              For the defendants in that case?
19              MR. CORN-REVERE:  This is Robert Corn-Revere
20    from Davis Wright Tremaine.
21              THE COURT:  All right.  Good morning.
22              Then for the other case, PG Publishing versus
23    Pittsburgh Commission on Human Relations,
24    Mr. Corn-Revere, I presume, you represent the plaintiff
25    in that case; is that correct?
```

1          MR. CORN-REVERE:  That's correct, Your Honor.

2          THE COURT:  All right.  Then who do we have

3    for the defendant in that case?

4          MR. KERR:  That would be me, Lawrence Kerr,

5    K-e-r-r.  I have co-counsel Mr. Kennedy and Ms. Kobee,

6    but I will be arguing.

7          THE COURT:  Good morning to everyone.

8          We are here on two motions to dismiss in both

9    of these cases.  I scheduled this to all happen at the

10   same time.  I'm not sure it had to be the case but I

11   just wanted to avoid any overlap.  There may not be any

12   overlap because the issues may be separate enough.

13         My plan was to start with the Johnson case,

14   hear the parties out on the motion to dismiss on that

15   and then move into the other case, the Pittsburgh

16   Commission on Human Relations case, but I am also open

17   to any suggestions if there is a different or better way

18   to handle it.

19         Any views or strong opposition to that plan,

20   Mr. Cordes?

21         MR. CORDES:  No, Your Honor.  I think your

22   plan -- I think that works well for me at least.

23         THE COURT:  Mr. Corn-Revere?

24         MR. CORN-REVERE:  We have the same reaction.

25   I think that organization works well for both cases.

1           THE COURT:  Okay.  Mr. Kerr, are you on board

2    with that?

3           MR. KERR:  Yes, we are fine with that.

4           THE COURT:  Let's start with the Johnson case.

5           Mr. Corn-Revere, since it is your motion, you

6    may proceed.

7           MR. CORN-REVERE:  Thank you, Your Honor.

8           May it please the Court, our position is

9    dismissal in this case is warranted based on four basic

10   facts about which there really is no dispute.

11          First, Ms. Johnson interjected her personal

12   views into a public debate through her Twitter feed and

13   then asked Post-Gazette editors to assign her to news

14   coverage of those same events.

15          Second, the Post-Gazette editors declined

16   Ms. Johnson's request to cover protest coverage

17   explaining that the Post-Gazette had a social media

18   policy that applied journalistic standards to avoid the

19   perception that the newspaper mix is commentary with

20   news coverage.

21          Third, that same policy was applied to all

22   Post-Gazette staff members who reposted the Johnson

23   tweets and did so regardless of race.

24          And fourth, no one was disciplined, demoted,

25   or financially sanctioned as a result.

1          So the sum total of Ms. Johnson's claim was

2     that the Post-Gazette editors declined to green light

3     three story ideas she pitched on June 1.  She was not

4     reassigned, nor was she removed from any stories she had

5     previously covered, nor was she prevented going forward

6     from covering social justice issues in general or Black

7     Lives Matter in particular.

8          The amended complaint fails to state a claim

9     under Section 1981 and the relief Ms. Johnson is

10    requesting would violate the First Amendment because it

11    would intrude on the Post-Gazette's ability to adopt and

12    enforce its journalistic standards.

13         Now there is no plausible Section 1981 claim

14    either for discrimination or retaliation.  That's true

15    for three basic reasons:

16         First, there was no impairment of any

17    contractual right and no discrimination.  Reporters

18    don't have a contractual right to demand that editors

19    accept the story ideas they pitch.  This is a fact of

20    life accepted by journalists in newsrooms all across

21    America and it's confirmed in cases involving labor law.

22         For example, in *Ampersand Publishing v. NLRB*,

23    the D.C. Circuit confirmed that this is not a legitimate

24    employee concern and said that editorial policies do not

25    constitute a term or condition of the employment.

1              Ms. Johnson asserts that the denial of her

2    story requests is a legitimate concern under Section

3    1981 because she is African-American, but this poses the

4    wrong question.

5              As the Supreme Court confirmed just last term

6    in *Comcast Corporation v. National Association of*

7    *African American-Owned Media*, Section 1981 directs our

8    attention to the counterfactual, in other words, what

9    would have happened if the plaintiff had been white; and

10   in this case, we know from the face of the complaint

11   what the answer to that question is.  We know that all

12   reporters and Post-Gazette staff members who reposted

13   the Johnson tweet were treated exactly the same way.

14             So there is no impairment of contractual right

15   and no discrimination and Ms. Johnson's claim fails at

16   the threshold.

17             Second, there was no adverse employment

18   action.  Ms. Johnson doesn't even allege any change in

19   her compensation, terms, conditions, privileges,

20   employment.  She was not reassigned, she was not removed

21   from any story that she was covering.  Editors not

22   accepting a story pitch is simply not an adverse

23   employment action.

24             Apart from not getting her requested

25   assignment, she alleges nothing else in her complaint.

```
 1  Not everything in the workplace that makes an employee
 2  unhappy is an adverse employment action.
 3           THE COURT:  Mr. Corn-Revere, I know in the
 4  amended complaint there are several allegations
 5  pertaining to what I guess I would call a comparator,
 6  another employee, a white employee who plaintiff alleges
 7  tweeted about something similar and the allegation is
 8  that the Post-Gazette did not prevent that individual
 9  from covering stories about the protests.
10           Can you talk to that?  Does that make this
11  case a little bit different than a situation where
12  there's just sort of an exercise of a pure editorial
13  decision by the Post-Gazette?
14           Here my sense of allegations in the complaint
15  is that that may be fine but here how the Post-Gazette
16  has treated white comparators gives rise to
17  discrimination and may -- I'm not sure if it touches on
18  the impairment of a contract or adverse employment
19  action or disparate treatment but if you can talk to
20  that, I would appreciate it.
21           MR. CORN-REVERE:  Certainly, Your Honor.  Let
22  me address that.
23           These are the comparisons that appear at
24  Paragraphs 31 to 33 of the complaint and there are
25  really two that are posed here.
```

1          One is allegations regarding another staff

2    member named Joshua Axelrod, that's Paragraphs 32 and

3    33, and the other one involves allegations, some social

4    media activity after the shootings of the Tree of Life

5    Synagogue.  That's at Paragraph 31.

6          Now there is very little description here to

7    show whether or not these allegations compare in any

8    way, and the Third Circuit decision in *Curay-Cramer v.*

9    *Ursuline Academy* says where you have allegations, you

10   have to show that those comparators are in many respects

11   the same.  As you'll recall, the Third Circuit upheld

12   the dismissal at the motion to dismiss stage where there

13   was a lack of any sort of real comparison.

14         Let me focus on those two in particular.

15   First, with respect Joshua Axlerod, the allegations made

16   that he posted something during the riots of someone

17   being a scumbag and he wasn't immediately taken off

18   coverage of the protests.

19         Two things about that.  One is it wasn't any

20   kind of viral tweet and as soon as the Post-Gazette

21   editors became aware that he had been involved in

22   activity, he was also taken off any kind of coverage.

23         Some kind of unspecified delay before the same

24   treatment is accorded doesn't rise to the level of a

25   discrimination between a white employee and other

1    employees and we're simply comparing very different

2    tweets and suggesting that the actions towards them was

3    somehow different.

4            Secondly, the allegations in Paragraph 31

5    regarding the Tree of Life Synagogue, again, as limited

6    as the factual allegations are, we have no idea what was

7    said or whether or not it was simply someone expressing

8    sympathy for the victims of these horrible shootings.

9            I suspect that if anyone had been involved in

10   Twitter activity saying don't worry about the killings

11   of the Tree of Life Synagogue, it's not worse than a

12   Kenny Chesney concert, I suspect that they would have

13   been taken off any coverage right away but, again, it

14   simply is not comparable.  It has to be a similar kind

15   of situation before you can say there is actual

16   discrimination.

17           What we do know is from Paragraph 29 of the

18   complaint where people posted the same tweet, the same

19   Johnson activity, all of them were instantly removed

20   from also covering events about which they had expressed

21   opinions.  So there is absolutely no credible allegation

22   of any kind of discrimination here.

23           Now there is a saying with respect to whether

24   or not there was adverse employment action.  There is no

25   dispute that there was no reassignment, no demotion, no

1   dock in pay.  Now, it's true there's been an attempt to

2   characterize what happened as some kind of punishment,

3   but as I say, reporters don't have story pitches

4   accepted all the time.  That hardly counts as punishment

5   and how the plaintiff chooses to characterize the events

6   doesn't change them for purposes of the law.  There

7   simply was no adverse employment action.

8          Third, there was no retaliation.  Now, in the

9   Third Circuit, as a prerequisite to bringing a

10  retaliation claim, there has to be an underlying Section

11  1981 violation.  Since we have already shown there was

12  no adverse employment action, this claim fails at the

13  threshold.

14          This is a requirement that the Third Circuit

15  has affirmed in *Estate of Oliva v. New Jersey*.  We

16  raised that in our motion to dismiss, and there's been

17  no response.  That threshold question simply goes

18  unanswered, but beyond that, for a retaliation claim,

19  there has to be an allegation of protected activity and

20  the complaints in Ms. Johnson's tweets about society in

21  general simply don't constitute protected activity for

22  purposes of Section 1981.

23          Once, again, the Third Circuit decision in

24  *Curay-Cramer v. Ursuline Academy* is both controlling and

25  is dispositive of this question.

1          Now, again, that case upheld the dismissal of

2     the discrimination claim at the motion to dismiss stage

3     and it went on to say that to be protected activity, the

4     opposition to an illegal employment practice must

5     identify the employer and the practice.

6          Now we have none of that here.  There was

7     nothing in Ms. Johnson's tweets that says anything about

8     employment practices, much less the Post-Gazette.

9          In fact, if you look at Paragraphs 13 to 17 of

10     the complaint, what it really is saying is Johnson

11     sought to, quote, ridicule the idea that protesters in

12     general and specifically African-American protesters are

13     destructive looters.  There is nothing here about

14     employment or complaining about discrimination on the

15     job.  That is a prerequisite to bringing a retaliation

16     claim.

17          Instead, Ms. Johnson claims that protesting

18     about conditions in society in general qualify for

19     protective activity, but *Curay-Cramer*, the Third Circuit

20     expressly rejected this theory of retaliation.  The

21     operative language in the opinion says we are not aware

22     of any court that has found public protester expressions

23     and belief to be protected conduct absent some

24     perceptible connection to the employer's alleged illegal

25     employment practice.  That's exactly what is going on

1   here.

2            Complaints to editors later on about the fact

3   that she wasn't assigned the stories that she requested

4   does not satisfy this threshold.  That doesn't

5   constitute a protected activity to make a retaliation

6   claim because we have a chicken and egg problem.

7            The original argument was that it was her

8   activity on Twitter that was protected communication and

9   then when the employer takes action based on its

10   policies to say we're not going to assign you to those

11   topics, that happens after the fact.  Once, again, the

12   *Curay-Cramer* case spoke to this directly saying that an

13   employer need not refrain from carrying out a previously

14   reached employment decision because an employee

15   subsequently claimed to be engaging in protected

16   activity.

17            So what happened with meetings and editors

18   later when she was displeased that she wasn't given the

19   assignments she requested doesn't bridge that gap.

20            Finally, First Amendment bars Ms. Johnson's

21   claims under Section 1981.  Now the question here isn't

22   whether or not newspapers are subject to generally

23   applicable employment laws.  No one has suggested that

24   they are not subject to them.

25            The question is whether a newspaper's

1   editorial judgment, including its ethics rules, can be
2   the subject of those complaints.
3           In this case, the complaint is nothing more
4   than a challenge to editorial policies like those
5   adopted by the Society of Professional Journalists, like
6   major news organizations like the New York Times, the
7   Associated Press, the Washington Post, and in this case,
8   the social media policy of the Pittsburgh Post-Gazette.
9           Now courts in employment cases have uniformly
10  held that the application of general labor law in
11  newspapers in ways that intrude on those kind of ethical
12  rules and editorial standards can't be allowed under the
13  First Amendment.  This happened in many cases involving
14  the National Labor Relations Board and cases like that
15  where it said that general labor issues simply cannot
16  intrude on those sorts of professional standards and
17  editorial judgments.
18          It was upheld in *Newspaper Guild of Greater*
19  *Philadelphia v. NLRB* and other cases that we mentioned
20  in our papers.  It was upheld in response to a
21  Washington state statute in *McClatchy Newspapers v.*
22  *Nelson.*
23          *THE COURT:*  Let me ask you this.  My
24  understanding of the First Amendment issue is that the
25  plaintiff here, Ms. Johnson, is basically I think

1   asserting that the Post-Gazette's basis or decision to

2   remove her from these stories or its discriminatory

3   treatment of her based on application of editorial

4   discretion or editorial control and judgment was

5   pretextual.

6          So the Post-Gazette might be absolutely right

7   that if it properly exercised its editorial control and

8   judgment, it would bar this particular claim or the

9   claims in this case, but as I understand the plaintiff's

10  argument, I mean I could be wrong, but I think where I

11  think they are going, yeah, that's all great but it's

12  pretextual.  That's not the real reason and, in fact, we

13  have statements from editors that suggest that it wasn't

14  based on editorial control and judgment but instead

15  based on racial animus, the decision was based on racial

16  animus.  What is your response to that?

17          MR. CORN-REVERE:  A couple things, Your Honor.

18          First, in terms of the claims about pretext,

19  the allegations about editors may be a comment or added

20  in the amended complaint and really makes some sort of

21  unspecified reference to statements made by Karen Kane

22  that don't directly link to Alexis Johnson.

23          They were really to begin with, as we point

24  out in our pleading, we think those allegations are

25  fabricated; but if you accept them as true for a purpose

1    of a motion to dismiss, they don't make a difference

2    here.

3              First of all, the question of pretext is not

4    relevant where you have black and white reporters being

5    treated exactly the same way, where you have a minority

6    employee being singled out and then it is argued that

7    they were treated differently and the pretext argument

8    is made, that's one thing.

9              Here on the face of the complaint the

10   plaintiff says all reporters who conducted this activity

11   in violation of policy were treated the same way.  So

12   the question of pretext really is not relevant.

13             Secondly, as a matter of law, in those cases

14   where pretext has been argued, the Courts have held that

15   the First Amendment still must prevail.  This was what

16   the D.C. Circuit said in *Ampersand Publishing Company v.*

17   *NLRB.*  It says that even if the Board properly found

18   that Ampersand proffered pretextual reasons for its

19   actions, the Board's analysis was tainted by the

20   mistaken belief that employees had a statutorily

21   protected right to engage in collective action aimed at

22   limiting Ampersand's editorial control over the free

23   press.

24             So, where you have a fully protected First

25   Amendment right to engage in adopting editorial

1   standards and applying them, you can't simply get around

2   that by trying to argue that there were bad reasons for

3   adopting things they had a right to do.

4           Here, again, it doesn't come up because the

5   face of the complaint tells us that all members of the

6   race were all treated exactly the same way.

7           Even if you do have an allegation of pretext

8   and it was relevant in this context, you still have to

9   make a prima facie showing of, first, that there was an

10  adverse employment action; and secondly, that there was

11  discrimination.  Those simply don't come up.  That, by

12  the way, was affirmed in *Daily News v. NLRB*.

13          So, again, even if we fully expect the

14  allegations of pretext to be repeated here, as they were

15  in the papers, they simply don't overcome the First

16  Amendment claim.

17          This was also affirmed in other cases

18  involving allegations of discrimination.  The Middle

19  District of Tennessee dismissed a 1981 claim in

20  *Claybrooks v. American Broadcasting Company* where it was

21  argued that the casting of the bachelor and bachelorette

22  were based on discriminatory motives and the Court

23  basically said it doesn't matter because in matters of

24  editorial judgment, those decisions simply can be made.

25          This is a principle in at least certainly

1  since 1995 when the Supreme Court unanimously decided

2  *Hurley v. Irish-American Gay, Lesbian, & Bisexual Group*

3  *of Boston*, that even in allegations of discrimination,

4  that First Amendment consideration still overrides.  So

5  that as a matter of law, the case should be dismissed on

6  First Amendment grounds.

7          Now, I'll close simply by addressing one of

8  the things Ms. Johnson claims about this.  She said she

9  is not claiming that her case says that the defendant

10 should have published any particular article or that she

11 is not trying to intrude on news judgment but that's

12 precisely what is going on here because the entire case

13 boils down to whether or not you can sanction a

14 newspaper or require them to cover certain things

15 because a reporter was upset that three stories she

16 pitched weren't accepted by the editors.

17          There is no other way to look at it than to

18 say if the Court were to rule in her favor, it would

19 either penalize the newspaper for its not adopting, not

20 having those stories, or on a going forward basis, would

21 have to accept those story pitches.

22          One thing that's probably worth noting is that

23 the claims for equitable relief in the complaint are

24 moot at this point because Ms. Johnson left the

25 Post-Gazette last October, something that hasn't been

1  noted in the papers, and if anything, she has gone on to

2  far greener pastures.  She is now a national

3  correspondent for Vice News doing video reports.  Her

4  new position has been touted on the alumni website of

5  Temple University.  She has appeared on panels.  So it's

6  hard to say that this incident that prompted the lawsuit

7  has damaged her in any way or is really subject to any

8  ongoing relief of an equitable basis as is requested in

9  the complaint.

10          So for all of those reasons, Your Honor, we

11  think the case should be dismissed.

12          THE COURT:  All right.  Thank you,

13  Mr. Corn-Revere.

14          Mr. Cordes, I can hear from you now.

15          MR. CORDES:  Thank you, Your Honor.

16          Your Honor, this is a case about what the

17  Post-Gazette did but it's more importantly, a case about

18  why and here on a Rule 12(b)(6) record, the record shows

19  that the defendant judged Ms. Johnson both by the

20  content of her tweets and also by the color of her skin.

21          It judged her by the content of her tweet,

22  which was a complaint of race discrimination in the

23  equal benefits or like punishment clauses according to

24  the U.S. Code Section 1981, and it also judged her by

25  the color of her skin.  We know that.  We know it

1  because the complaint pleads that the defendant's own
2  decisionmaker admitted as such.

3          Paragraph 21 of the amended complaint pleads
4  the defendant's decisionmaker informed Ms. Johnson that
5  because she had opposed and spoke out about racism, she
6  was precluded from covering any stories about
7  discrimination.

8          On a Rule 12(b)(6) motion, that is the record,
9  and defendant's defenses and things they would say are
10 all very interesting and all very relevant, I suppose,
11 once we get to discovery, but on a 12(b)(6), that is to
12 be believed and any inference that is to be drawn from
13 that is the one that favors Ms. Johnson.

14         How do we know that the color of her skin was
15 taken into account?  The amended complaint pleads it.
16 Paragraph 26, during the first week of June 2020, that
17 is shortly after the tweet, the decisionmaker complained
18 to another assistant managing editor that I can't do
19 anything now about black people.  I have to pick better
20 targets.

21         Again, Your Honor, the Third Circuit as
22 recently as two weeks ago said a complaint need only
23 raise the plausibility and I think those paragraphs
24 themselves do it.

25         Now, I would like to address the defendant's

1    kind of arguments about the protected conduct.  Your

2    Honor, this is not a case under Title VII, at least not

3    at this point because it is still in the administrative

4    procedure.  It's under 42 U.S.C. Code Section 1981 which

5    is not an employment statute.  It involves two issues.

6            One, it precludes race discrimination in the

7    making and enforcement of contracts and any part of the

8    contractual relationship.  It was amended in 1991 to

9    make it specific that a term or condition of employment

10   is part of the contractual relationship.  It's 32 U.S.

11   Code 1981(a) I believe is the statute.  Section 1981

12   precludes race discrimination in the provision of full

13   and equal benefits and like punishments.

14           Well, why am I going over that?  Well, because

15   the Third Circuit has talked about, and it was, in fact,

16   a leader in talking about what that means, what the full

17   and equal benefits and like punishment means; and what

18   it means, Your Honor, is that complaints or actions by

19   either selective enforcement of the law or actions of

20   different treatment by police predicated on race is a

21   violation of the full and equal benefits clause.

22           My friend says in his papers, well, that

23   doesn't matter because we are not a public employer and

24   I agree, but the nature of retaliation, Your Honor, as

25   the Supreme Court has said in the *Cracker Barrel* case

1   and in the *Burlington* case, two things.

2          First, it does not have to be about the actual

3   plaintiff, that is, a person who complains about race

4   that contravenes -- race that would contravene Section

5   1981 is engaging in protected conduct.  So what that

6   means is the race discrimination Ms. Johnson opposed

7   need not specifically involve her.  It's someone else's

8   right to be free of racial discrimination is clearly

9   encompassed and we know that because the Third Circuit's

10  own model jury instructions instruct the Court to charge

11  the jury as such.

12          The race discrimination that is the subject of

13  protected opposition need not be undertaken by the

14  retaliation of plaintiff's own employer or by the

15  defendant in this case.  The Courts have repeatedly said

16  that, including the Supreme Court in the *Cracker Barrel*

17  case.

18          THE COURT:  I'm not familiar I guess with the

19  *Cracker Barrel* case.  Tell me what happened in that

20  case, if you can.

21          MR. CORDES:  It's cited in the papers, Your

22  Honor.  It's *Cracker Barrel West v. Humphries*.  It's 553

23  U.S. 442.  In the case, the issue was whether

24  retaliation claims are encompassed by 42 U.S. Code 1981

25  because the language of the statute does not

1    specifically say the word "retaliation."

2            Justice Breyer discussed both why it was and

3    also what it encompassed and I'll read from the case

4    specifically, Your Honor.

5            Retaliation cognizable under Section 1981

6    includes claims by an individual whether black or white

7    who suffers retaliation because he has tried to help

8    different individuals suffering from racial

9    discrimination.

10           So it takes a broad, a very broad look, and

11   every circuit sort of has agreed, it takes a broad look

12   at what is protected conduct under Section 1981.  It

13   reminds us, for example, that 1981 covers far more than

14   employment, although it does cover employment because

15   employment is a contractual relationship.

16           When I agree to work for you for five dollars

17   an hour, we created a contract, whether it's a formal

18   sort of thing or not, even if it's an at-will contract

19   and the Supreme Court has discussed that issue, too.

20           So the fact that we have no specific

21   contractual right to any specific assignment is again

22   interesting but not really all that relevant under

23   Section 1981 jurisprudence according to what the Supreme

24   Court says.

25           THE COURT:  Before I ask you this, I think I

```
 1   hear some feedback from somebody else on the line, so if
 2   everybody else can mute their line, I would appreciate
 3   it.
 4           Thank you.
 5           Tell me I guess maybe the best or most
 6   factually analogous case on protective activity.  It
 7   seems like most of the cases I have seen, they involve
 8   either the employee or the employer, that the protective
 9   activity, the employer, some entity may be as related to
10   the employer, the conduct that touches on employment.
11           Here you had a situation where the tweet seems
12   to be a broader commentary on a societal issue.  I'm
13   trying to figure out one, what is sort of the best
14   factual analogous case to this one?
15           Two, how do you draw the line?  Obviously,
16   there's got to be some line drawn?  What are the
17   principles here that would trigger something being a
18   protective activity in your view?
19           MR. CORDES:  Your Honor, let me just
20   take -- I'm not avoiding the direct question.  I want to
21   take a small side trip for one second.
22           I'll give you an example of something that
23   would be.  If you remember after the January 6
24   insurrection of the Capitol, there was a number of both
25   commentators, politicians and I believe even -- well,
```

1    clearly politicians and commentators that were saying if

2    that crowd had been African-American and had done the

3    same thing, there would have been mass shootings of them

4    and we would be having a hundred George Floyds all over

5    again.

6            That kind of conduct is not all that

7    dissimilar to what the tweet was in this case.

8            Now, your question was a lot of the cases,

9    Your Honor, I agree, arise in the context of Title VII

10   and in Title VII, what the statute says is that it makes

11   it an unlawful employment practice for an employer to

12   either retaliate against an employee but not its

13   employee.  That's the distinction that's been made by a

14   number of courts.

15           So, for example, in the *Flowers v. Columbia

16   College Chicago* case, I believe it is cited in our

17   brief, the employee of Columbia College complained about

18   discrimination at a prior employer.  There is a case in

19   this district by, I guess by former Chief Judge Conti,

20   it was affirming a magistrate judge's decision.  It was

21   *Cestra v. Mylan*.  I don't believe this is cited in the

22   briefs, but in that case, it was a retaliation case

23   brought under the False Claims Act where Mr. Cestra had

24   made a complaint or filed a qui tam action against a

25   former employer and then moved on to a different

```
 1   employer and once the seal was lifted on the qui tam,
 2   Mylan, who is the defendant, fired him because of that
 3   and Mylan moved to dismiss alleging that it only affects
 4   actions where he complains about us and the Court denied
 5   that.
 6             Judge Conti certified it for Third Circuit
 7   review and the Third Circuit didn't even take the case
 8   because it was so obvious, the language of the statute.
 9             Now, having said that, in the 1981 context,
10   there are not many direct retaliation cases that are
11   brought where this is addressed under the equal benefit
12   like punishment clause.  I think the *Cracker Barrel v.*
13   *Humphries* case is a very good starting point, though,
14   because it speaks about the issue that the whole notion
15   of Section 1981 was to protect the people who took the
16   side of former slaves during the reconstruction and the
17   statute was passed in 1866, right after the Civil War
18   and was, indeed, put into place to protect both former
19   slaves under the Thirteenth Amendment but also those who
20   provided support for them.
21             The case I can point you to, though, Your
22   Honor, that is outside of the *Cestra* matter, there is a
23   case called *Hoffman v. Rubin* out of I believe it's the
24   Eighth Circuit.  It's cited in the materials.  I believe
25   it's the Eighth Circuit, Your Honor.
```

1          In *Hoffman v. Rubin*, again, a Title VII case

2    but instructive on the issue.  Mr. Hoffman went on 60

3    Minutes television show and had a limited discussion

4    about sexual harassment, didn't complain specifically

5    about my employer but talked about the notion of sexual

6    harassment at the time that his employer was going

7    through a bunch of sexual harassment allegations.

8          Again, a limited opinion to the extent that

9    the Eighth Circuit simply said that is one clear example

10   of what is protective conduct because he was talking

11   about or opposing actually is the word a matter that

12   would have been a violation of Title VII.

13         The Supreme Court in every situation where it

14   has addressed what is protected conduct has broadened

15   that definition.  For example, in the *Crawford* case,

16   again, cited in the materials, the Court said even

17   standing pat in the face of an employer's racist policy,

18   that is saying I'm not going to do that or I'm going to

19   avoid helping that is protected conduct.  It doesn't

20   have to be active sort of conduct.

21         Again, Your Honor, the *Caplan* case cited in

22   our materials involved a situation not totally

23   dissimilar from this.  There was a Section 1981 claim

24   brought by Ms. Caplan who alleged that a tweet or a

25   Facebook post, I guess it wasn't a tweet, that she liked

1    or reposted, made fun of the owner of the Los Angeles

2    Clippers.  If you recall a few years back, Your Honor,

3    he had made some very racist statements and the post was

4    a picture of a Ku Klux Klansman with a Los Angeles

5    Clippers' uniform on and the post was Tuesday night is

6    bobble head night at the Clippers and giving out free

7    Ku Klux Klan sheets, something like that.

8           There were two posts, and the case went to the

9    Third Circuit on whether two things:  Whether there was

10   protective conduct, and whether there was causation that

11   caused it.

12          The Third Circuit found that the post about

13   the Klan was protected.  It affirmed the judgment below

14   because there was another post that was posted that said

15   it was not protected and, therefore, irrespective of

16   that, though, the plaintiff would have been fired; but,

17   again, a non-precedential opinion written by Judge McKee

18   but still instructive on what kind of conduct had to do.

19          This person worked for I think it was one of

20   the Limited stores, Victoria's Secret or some such

21   thing, didn't work for the LA Clippers, had nothing to

22   do with employment of the LA Clippers but was posting a

23   post, and Judge McKee said, and I quote this in the

24   brief, there is a factual question about

25   whether -- wait.  Let me just see so I have the direct

1    quote.  The fact may well exist as to the Sterling post,

2    its message could properly be interpretive of mocking a

3    racist business owner just as Caplan explains and,

4    therefore, it fell under the protective umbrella of

5    Section 1981.

6             There is a mistake in the opinion where Judge

7    McKee wrote it's protected under the First Amendment but

8    it was clearly a Section 1981 claim.  It was a

9    typographical error in the opinion which my opponent

10   seems to make much about it, but the Third Circuit must

11   not have known what it was talking about.  I don't know

12   if this Court gets to do that, makes those decision; but

13   nonetheless, that is an example of protective conduct.

14   Out of this district actually in a very recent case, I

15   believe it was 2017 or '18, where a 1981 claim dealt

16   with a non-employer of the plaintiff but conduct that

17   was opposing racial discrimination.

18             In that situation, it would have been racial

19   discrimination in a contract but there is no difference

20   for opposing racial discrimination that would be a

21   violation under the like benefit clause and the fact

22   that someone is complaining about government

23   discrimination if it motivates the current employer.  I

24   agree, Your Honor, that's where the link ultimately

25   needs to be made, and I think on a 12(b)(6), the link is

1   made because the defendant said so.

2           THE COURT:  I guess if I'm understanding the

3   line here, the standard is if an employee makes a

4   comment that deals with racial discrimination of any

5   kind, then your view would be that is protective

6   activity; and if the employer takes an adverse action

7   against the employee for making a comment with respect

8   to racial discrimination, I guess, is that kind of the

9   standard, then that would be protective activity?

10          MR. CORDES:  I think the Court doesn't have to

11  go that far, Your Honor.  I think the standard needs to

12  be racial discrimination that is violative of the

13  statute or that the employer would reasonably believe to

14  be violative of the statute.

15          In the Title VII context, although, again, the

16  Supreme Court has not said that it has to be employment

17  related.  In fact, the Supreme Court has said just the

18  opposite.  It says you can retaliate against someone

19  outside of the employment context, but for our purposes

20  here, if there is a reasonable good faith belief that

21  that complaint would be a violation of the equal like

22  benefit or equal treatment clause of Section 1981, that

23  is sufficient; and in pleading that in a complaint, it

24  simply needs to have done that.

25          Is it reasonable to believe that a complaint

1   that is not dissimilar in any way, Your Honor, from a

2   complaint that had the insurrectionists been

3   African-Americans, they would have been shot by the

4   police.  That's exactly what Ms. Johnson said.  Had the

5   people at the Chesney concert would have been

6   African-American -- I'm sorry.  Vice versa.  Had the

7   Black Lives Matter protesters been treated or were

8   treated less well than the Kenny Chesney concertgoers.

9   It is an allegation of selective enforcement of law and

10   different treatment by police predicated on race and

11   that is the complaint that links it to Section 1981.

12         THE COURT:  Going to your point, there has to

13   be a link to the statute.  There has to be a violation

14   of the statute of some kind.  It has to be violative of

15   Section 1981.

16         As I read Section 1981, it is broader than

17   Title VII but there is a tie-in to a contractual

18   impairment or terms, violation of terms or conditions.

19         Does there not have to be -- I guess explain

20   to me in what way here this is a violation of Title VII.

21   I'm just a little bit concerned with I guess the

22   position here in the complaint that it's too broad.  If

23   anybody makes an allegation with respect to a problem

24   about race and society that does not impact any type of

25   employment relationship or contract, it becomes an

1  unmanageable standard.  I'm just trying to figure out

2  what would be the line.

3          MR. CORDES:  Sure, Your Honor.  The standard

4  is not unmanageable in what we're talking about here.

5  While the Court absolutely correctly recited the first

6  part of Section 1981, there is a second part, Your

7  Honor.

8          What it says, and let me pull it up.  I

9  learned this in law school.  The first thing you want to

10 know about the statute is read the statute.

11         Section 1 says, All persons shall have the

12 same rights to enforce contracts; but the second clause

13 of Section 1981 says, and to the full and equal benefit

14 of all laws and proceedings as is enjoyed by white

15 citizens and shall be subject to like punishment.

16         Now what the Third Circuit has said about that

17 in *the Mahone v. Waddle* case back in 1977 is that

18 racially motivated misuse of government power falls

19 within the ambit of the state's equal benefits and like

20 punishment clause; and then in the *Hall* case, which is

21 *Hall v. Pennsylvania State Police*, again this is cited

22 in the materials, the Third Circuit says, Selective

23 enforcement of laws or different treatment by police

24 predicated on race are encompassed within the equal

25 benefits and like punishment law.

1           So, what we have here is the tie-in to the
2    Section 1981 violation.  Ms. Johnson was complaining
3    about like punishment and selective enforcement of laws
4    because she was saying that had the Black Lives Matter
5    protesters been treated the way the Kenny Chesney people
6    were or conversely, had the Kenny Chesney people been
7    treated the way the Back Lives Matter protesters were,
8    there would have been multiple arrests, et cetera.
9    Again, that's the link.  It's not an ongoing, any kind
10   of race-based complaint.
11           Those two statutes, Title VII.  Again, Your
12   Honor, the Court was mixing with saying, well, was there
13   employment.  Title VII talks about employment.  Section
14   1981 is not cabined by employment.  The Supreme Court
15   said it as clearly as possible in the *Humphries* case,
16   the *Cracker Barrel v. Humphries* case, that it's much
17   broader than employment.  That was a sort of very quick
18   decision on that issue.
19           So while we're dealing with an employment
20   relationship here, that is not the cabin of a protective
21   opposition under Section 1981 for the protected conduct.
22           THE COURT:  I think I understand that issue
23   and I think you can move on to another issue, but before
24   you do, sort of on a related note, other than that
25   tweet, is there any other protective activity that you

1  allege in the amended complaint on which you base your
2  retaliation claim?
3          MR. CORDES:  There were two, Your Honor.
4          One was the tweet, which predicated the
5  discussion that happened the next day where she was told
6  she was being taken off these various assignments that
7  were part of her natural beat.  In newspaper parlance, a
8  beat is an assignment you normally cover.  My beat is
9  the courts.  I cover the courts, for example.
10         In addition to that, Ms. Johnson complained
11 that this taking her off this was based on two things.
12 It was based on her race and based on the fact that she
13 had opposed race discrimination.  A fair reading of the
14 complaint supports that.
15         Even defendant's argument, Your Honor, that,
16 well, we also took off everybody who joined in
17 Ms. Johnson's complaint, the defendants use that to
18 argue, well, we punished white people but that's not the
19 point, Your Honor.  The point is that anybody that made
20 that same complaint about racial bias and treatment and
21 selective enforcement and like punishment was also
22 precluded from this assignment.
23         The defendants say, well, they were white.  I
24 say so what.  If I am a white person and complain about
25 race discrimination and go into my employer and say you

 1   were treating others, just to use a simple example, you

 2   were treating my African-American colleague in a

 3   racially discriminatory manner and I get fired about it,

 4   the fact I'm white is kind of irrelevant for purposes of

 5   whether the employer has violated the retaliation cases.

 6           This Court recognized that in the

 7   Congerson (phonetic) matter, case, about a year or two

 8   ago.  That's where the pleading on that is.

 9           The second part, Your Honor, moving on, the

10   adverse action.  The problem is defendant says that

11   there was no tangible adverse action, therefore, we

12   didn't do anything wrong.

13           The problem is they have the wrong legal

14   standard.  The Supreme Court in the *Burlington Northern*

15   case, cited in the materials, but it's 554 U.S. 53,

16   outlines the standard when there is a retaliation claim,

17   and a retaliation claim occurs when an employer takes

18   what is called a materially adverse action.  What's

19   that?  Well, the Supreme Court defines that.  It is one

20   that might persuade a reasonable worker from making a

21   charge or supporting a charge of discrimination.

22           What the Supreme Court said is even more

23   important is that standard is context driven, factual,

24   and a jury question.  I'm quoting from Pages 72, 73 of

25   the opinion.

 1          What do we have here?  Well, what we have here
 2    is a reporter who was assigned to a beat, social media,
 3    and the coverage of which at the time, lots of the Black
 4    Lives Matter protest movement clearly in the summer of
 5    last year, seems like forever now, but it really wasn't,
 6    was occurring on social media; but the question is, Your
 7    Honor, so what.  So you took her off a beat.  Is that
 8    materially adverse?  That's where the Supreme Court says
 9    it's context driven, which is why it's clearly not
10    proper for dismissal as a matter of law under
11    Rule 12(b)(6).
12          Who covers stories in the newspaper business
13    matters.  Your Honor, Joe Slump, the copyboy, is not
14    covering the impeachment hearing of the former
15    president.  It is the best reporters that the media
16    operation has.  It makes or breaks careers as they often
17    say.
18          I often refer back to the story where Dan
19    Rather happened to be in Dallas on the day President
20    Kennedy was killed, and his reporting of that story made
21    his career and he is now a famous anchorman and the
22    like.
23          In the context of the newspaper business, who
24    covers the important stories matter and to take someone
25    off of that, the factual jury question becomes in the

1   context of a newspaper is might that dissuade a

2   reasonable reporter, who is at the beginning of her

3   career by the way or very shortly or very close to the

4   beginning of her career, from making or supporting a

5   cause of discrimination.

6          If you tell a reporter that wants to advance

7   her career that if you complain of race discrimination,

8   you are going to be taken off the coverage of the White

9   House beat or some such thing, that employee clearly is

10  going to be dissuaded and that question becomes one that

11  is factual on a jury question the Supreme Court said.

12         So looking at the right standard here, there

13  was a material adverse action, Your Honor.  Even the

14  case where the Supreme Court decided that, the

15  *Burlington Northern* case, the employee was reassigned,

16  suspended and ultimately with no loss of pay, but the

17  Supreme Court said there are actions, there are some

18  jobs that are less glamorous, so to speak, and that is a

19  factual question about whether that is materially

20  adverse.

21         So, again, if we were on summary judgment

22  here, Your Honor, or perhaps at trial, I could

23  understand perhaps the argument of my colleagues that

24  this might not be enough factually, but I think here for

25  the pleading stages, I believe it clearly is.  I believe

1   even beyond summary judgment, Your Honor, there is

2   enough that it would dissuade a reasonable employee or

3   reasonable reporter.

4           The defendants in their papers mention

5   causation on a 12(b)(6) standard, Your Honor.  I don't

6   know how one pleads causation any clearer than to plead

7   that the decisionmaker said that because you engaged in

8   this conduct, the action I'm taking is causing it.

9           Under *the Bostock* decision, Your Honor, her

10  complaint, Ms. Johnson's complaint about discrimination

11  needs to be a but-for cause and what a but-for cause

12  means is one of several.  It doesn't have to be the sole

13  one.

14          The Supreme Court said that the but-for

15  standard applies in Section 1981 and in the *Bostock*

16  case, it defined what but for means, and what but for

17  means, events could have multiple causes of protected

18  trait, not need be the primary reason, to be the

19  "but-for" cause of the reason, and but for clearly does

20  not have to be the sole cause and that is what the

21  standard for Section 1981 needs to be.

22          Now *Bostock* was decided under Title VII but it

23  wasn't decided under the motivating factor standard of

24  Title VII which is a separate part of the statute.

25  Justice Gorsuch talked about what but for means for

1    purposes of discrimination statutes and here we have as

2    clear as can be in the *Comcast* case a month or two

3    before *Bostock* where the Supreme Court said the but-for

4    causation is the standard in 42 U.S. Code 1981.

5           Your Honor, the First Amendment issue, I think

6    there are two things that the Court says about First

7    Amendment issues in the context of employment matters

8    and what I believe a synthesis of those cases are is

9    that a media defendant cannot be told what to publish,

10   but the courts that have addressed this issue have said

11   who publishes is not what.

12          So, for example, I cannot tell the

13   Post-Gazette -- not I but no one can tell the

14   Post-Gazette write stories about Black Lives Matter, for

15   example.  That's not what we are here arguing at all,

16   Your Honor.

17          What the Post-Gazette didn't say is we are not

18   going to cover Black Lives Matter.  What the

19   Post-Gazette said is, you, Ms. Johnson, are not going to

20   cover Black Lives Matter.

21          So the defendant's arguments only work if what

22   they are arguing is that because of the First Amendment,

23   because of what you claim is the essence of editorial

24   judgment, we can decide that blacks cover certain

25   stories and whites cover certain stories because

1  anything else is inconsistent.  The Post-Gazette will

2  deny this, I'm sure, they'll run through this, but it is

3  inconsistent with what the courts have said.

4       What the courts have said in every situation

5  where this has been addressed is that editorial judgment

6  is the issue about what to publish.  It's not the issue

7  about who.

8       In the materials, the *Hausch* case is very

9  close to this, Your Honor.  The person who brought the

10  suit was complaining that he wasn't made a managing

11  editor or some promotion because of his race and the

12  newspaper argued, well, no, the essence of editorial

13  judgment is that we get to pick who our managers are.

14       The Court rejected that.  They rejected it

15  with very common sense, Your Honor.  We are not

16  saying -- we are not regulating content.  We are saying

17  who gets to make those decisions and the people that get

18  to make those decisions cannot be appointed where race

19  is a determinative factor.

20       That is all we're saying here, Your Honor.

21  Constitutionally, we are not saying that the

22  Post-Gazette had to do these stories.  We are not saying

23  that they had to do any or not do any stories.

24       What we are saying is if you are going to

25  cover it and you are going to say that the only people

 1  who will cover this are white, for example, or the only

 2  people who will cover this are people who have not

 3  expressed opposition to discrimination, then that is a

 4  violation of either Section -- well, 42 U.S. Code 1981

 5  or perhaps down the road to Title VII, if this comes to

 6  this.  That is a who question, Your Honor, and a who

 7  question is not content based unless the Post-Gazette is

 8  going to argue that our decision to only have whites do

 9  a certain kind of story is a content-based editorial

10  decision.

11          I haven't heard the Post-Gazette say that.  In

12  fact, it has run from it in both its papers, in this

13  case and the companion case.

14          So what are we arguing here then?  The

15  Post-Gazette either says that who we use to do this is

16  an editorial decision or they have to admit that there

17  is no limitation on a generally accepted law that says

18  you cannot hire or dismiss or assign people based on

19  their race.

20          That does not impact the First Amendment and

21  the cases that talk about this, Your Honor, are all

22  situations like the Tennessee case that my friend

23  mentioned where it was a TV show and the race of the

24  subject was a message that they were sending.  The

25  Tennessee court was pretty explicit on that.

1          I don't hear the Post-Gazette saying that the

2    race of our reporters are a message we are sending.  If

3    the Post-Gazette wants to say that, by all means let's

4    hear that.  They have run from that.

5          So I think this constitutional argument they

6    are making that Title VII and/or for the companion case

7    or Section 1981 somehow is unconstitutional because it

8    limits our editorial judgment, I think it's a red

9    herring, Your Honor.  Unless they are going to come

10   forth and say the real reason they are doing it, but in

11   this case, Your Honor, it does not.  Who writes any of

12   the news stories is not a matter of editorial judgment,

13   although that is what the Post-Gazette says in their

14   briefs.

15         There is no court that has said, and they are

16   asking this Court to take the lead in this one, and say

17   the decision of who writes our stories is protected by

18   the First Amendment even in the face of an allegation of

19   race discrimination.  Your Honor, that's just not the

20   law, nor do I think that the court of law will ever go.

21              THE COURT:  All right.  Thank you, Mr. Cordes.

22         Before I will allow Mr. Corn-Revere to get the

23   last word, if there are any responses, but before that,

24   one thing I guess somewhat unrelated to the motion to

25   dismiss but what Mr. Corn-Revere raised was the fact

1    that Ms. Johnson has now gone on to greener pastures.

2                If this case proceeds, are there damages here

3    that the plaintiff would be seeking?  I don't know if

4    there is going to be a difference in wages or what have

5    you.  As sort of a practical matter, I do worry, is this

6    a great academic exercise but there is going to be no

7    real claim here?

8                MR. CORDES:  Your Honor, under the damages

9    standards of both Section 1981 and the companion case

10   that I will be talking about next, the statutes provide

11   for both injunctive and declaratory relief, so there

12   will be a damage claim made.

13               It's obviously the fact that Ms. Johnson left

14   for another job was not totally unrelated to what

15   happened here, and that's a fairly sophisticated damage

16   argument, Your Honor, that I haven't made for about 20

17   years; but, again, it is actually compensable if the

18   reason she left was because of the conduct.

19               I agree if she is making more money, and I

20   believe she is right now, that will be an issue.

21   Mitigation, obviously, is going to be an issue.

22               THE COURT:  Okay.  One other sort of practical

23   question here.  I think you had mentioned potentially

24   the Title VII claim is being exhausted or is in the

25   process of being run through the EEOC.  Where do you

```
 1   stand in that?  Are we still a ways from that?  My sense

 2   is I presume once that is exhausted, if this case

 3   remains, you would seek to add those claims to this

 4   case; is that right?

 5             MR. CORDES:  Your Honor, there is a claim that

 6   is filed on behalf of Ms. Johnson with the Pittsburgh

 7   Commission on Human Relations which is an EEOC

 8   derivative sort of.  So at some point when that is

 9   exhausted, we will make that decision.

10             I assume if it's exhausted in this case in

11   this proceeding, we would amend.  The problem, of

12   course, is their investigation is stayed right now.

13             THE COURT:  I see.  I wasn't sure of the

14   interplay between the Pittsburgh Commission and the EEOC

15   if there were sort of separate tracks.

16             The exhaustion of that claim would have to go

17   through the Commission is basically what you are saying?

18             MR. CORDES:  The EEOC, the Pennsylvania

19   Relations Commission and the Pittsburgh Commission, they

20   all have sort of a work-sharing agreement.  So filing

21   with one is tantamount to filing with the other.  In

22   fact, there doesn't need to be a filing.  That's the

23   other thing.

24             The Pittsburgh Commission brought the case

25   initially without Ms. Johnson even requesting to and
```

1    that's sufficient to exhaust if they were investigating

2    her claim even if she hadn't physically filed one.

3            We do have to exhaust.  So that's why we are

4    interested in what happens in the other case, obviously.

5            THE COURT:  I see.  That's helpful.  I

6    appreciate it.  Thank you.

7            Mr. Corn-Revere, any further response?

8            MR. CORN-REVERE:  Yes.  Thank you, Your Honor.

9    I will try not to take up too much of the Court's time.

10           What I'll try to do is focus on areas in which

11   you asked questions and try to give our perspective on

12   those.

13           I think your first question for Mr. Cordes was

14   what is the most analogous case to this one in talking

15   about whether or not there was retaliation and he talked

16   about certain cases like I believe -- well, he actually

17   talked about the capitol riots and so on and the *Cracker

18   Barrel* case, but really the most analogous case is the

19   one I mentioned earlier and is the controlling Third

20   Circuit case of *Curay-Cramer v. Ursuline Academy*.  That

21   is a case where a teacher at a Catholic school signed an

22   ad in supporting *Roe v. Wade* and where the argument was

23   made complaining about society in general.  She morphed

24   this into a general complaint about sex discrimination

25   at the school.

1          The Court rejected that saying there are no

2     cases that have been decided saying that public

3     protester expressions of belief are protected conduct

4     for purposes of a retaliation claim.

5          At that point, Mr. Cordes mentioned his case,

6     *Caplan v. L. Brands/Victoria's Secret*.  That really does

7     not provide support.  It doesn't stand for the

8     proposition that a general complaint will meet the test

9     for Section 1981 retaliation.  In fact, Mr. Cordes made

10    the same argument in that case that he made here in the

11    district court that posts intended to protest race

12    discrimination in society and in general and both the

13    district court and the Third Circuit held that the

14    allegations didn't qualify under Section 1981.

15         Now, Mr. Cordes will tell you that the Third

16    Circuit said the posts regarding Donald Sterling and the

17    LA Lakers was, quote, arguably about that but there are

18    two problems there.

19         One is unlike this case, that Facebook post

20    did talk about employment discrimination and it was said

21    mocking a racist employer, whereas here we have posts

22    that talk about Kenny Chesney concerts and about how

23    police treat protesters in general.

24         There is no link to employment and if anything

25    is clearer from *Curay-Cramer*, it is the holding that

opposition to an illegal employment practice must
identify the employer and the practice, none of which
occurs here.

It was said to be arguable in the *Victoria's
Secret* case but still wasn't enough to save the claim;
and both the district court and the Third Circuit held
that those claims were dismissed. As a matter of fact,
it's not precedential but I think it does more to
support our position than it does Ms. Johnson's. It's
also worth noting that case is not precedential as we
pointed out in our papers.

Again, I think there really is, as Your Honor
asked, there really is no logical stopping point if any
complaint about society in general can trigger
protective activity under Section 1981's retaliation
provisions. We never disputed the point that there can
be retaliation claims under Section 1981. That's not in
dispute.

The question is what constitutes protective
activity and as a baseline minimum, there must be a
complaint about employment practices, even if it doesn't
name the specific employer. Otherwise, as your
questions suggested, there would be no limiting
principle whatsoever to what we constitute as protective
activity.

1              As Your Honor asked, anything other than the

2    tweet that would be considered protective activity, and

3    there really was nothing other than saying she didn't

4    like the fact that the Post-Gazette made the decision

5    that it did.  There is simply nothing here that

6    qualifies for protective activity under Section 1981.

7              There was also essentially no adverse

8    employment action.  As I mentioned earlier, the sum

9    total of the claim here comes down to the fact that on

10   June 1st, Ms. Johnson pitched three story ideas that her

11   editors declined.

12             In response to that, Mr. Cordes talks about

13   how she was taken off her beat and those things can make

14   or break careers.

15             One thing, there is no plausible allegation

16   that she was taken off a beat.  There is no such beat as

17   covering riots.  She continued to write stories on

18   social media and there was no adverse actions in terms

19   of position or demotion or her status for pay.

20             In terms of whether or not this could make or

21   break her career, I think it's clear she was not barred

22   from covering social justice issues in general.  There

23   is no allegation she was barred from covering social

24   justice issues in general or Back Lives Matter.

25             In fact, this isn't in the record but I think

1   it's worth mentioning since Mr. Cordes was talking about

2   how this has affected her career.  In July, it was

3   published in the Post-Gazette first a story talking

4   about PSA features deaf community and inclusivity within

5   the Black Lives Matter movement and that was published

6   on July 29.  That isn't mentioned in the papers, and on

7   July 30, there was a controversy with the Port Authority

8   about whether or not workers of the Port Authority could

9   wear Black Lives Matter face masks.  That, I think,

10  ended up in a case before Your Honor that was decided

11  last month.

12          So, in terms of covering important social

13  justice issues, Ms. Johnson was able to continue to do

14  that.

15          Now, admittedly, these two stories aren't in

16  the record because they weren't mentioned in the papers

17  but they were published in the Post-Gazette so they are

18  matters for which the Court can take judicial notice,

19  and the fact is there are no allegations in the

20  complaint about how this has affected her career.

21          There was an exchange on that later talking

22  about the fact she has gone onto greener pastures.  She

23  has been able to go onto greener pastures because of

24  this case, she has exploited this case to go onto

25  greener pastures.  So the movement to Vice News, which

1    Mr. Cordes acknowledges is for higher pay, was the

2    subject of a front page Temple University story on the

3    web page for the Klein College of Media and

4    Communication on January 20, 2021.

5            The allegations simply aren't in the complaint

6    that there has been any kind of -- oh, there was one

7    other point I wanted to make about the *Caplan* case.

8    Sorry for the disjointed nature of this but it just

9    occurred to me as I was talking about this.

10           The fact that in the *Caplan* case even for the

11   aside of the Facebook post in that case, one of which

12   could arguably be construed as relating to a race

13   relationship to an employer, the Court said her

14   dismissal was determined anyway because she had also

15   posted things on Facebook that justify her termination.

16           This I think speaks to the argument that

17   Mr. Cordes was attempting to make about *Bostok* and

18   whether or not the but-for cause or motivating factor

19   cause can apply here because if there was a separate

20   reason that justified the termination in the *Caplan*

21   case, the same is true here where you have a violation

22   of the social media policy as being a justification.  I

23   just wanted to make sure I covered that before moving

24   on.

25           Finally, I don't want to take too much of your

1   time on this but I do want to address a couple points

2   about the First Amendment issue.

3           To hear Mr. Cordes tell it, this is only a

4   question of whether or not the Post-Gazette is being

5   told what stories to publish.

6           We've never maintained that.  This is a matter

7   of interference with editorial standards.

8           Again, it's hard to talk about this without

9   noting the extent to which what's really at stake

10  continues to be changed in the retelling of what's going

11  on here.  As I mentioned and mentioned several times,

12  this is all about whether or not the Post-Gazette was

13  willing to accept story pitches on one day and whether

14  or not all reporters were treated the same way.

15          Mr. Cordes said it's whether or not the

16  Post-Gazette has a First Amendment right to assign black

17  reporters to one story and white reporters to another.

18  Again, that's not the issue.  The question is whether or

19  not the Post-Gazette can apply its editorial policy to

20  all reporters, and in this case, that's exactly what

21  happened.

22          Ms. Johnson took a public position on a public

23  controversy and the Post-Gazette applied its policy and

24  said that she couldn't cover the three stories she

25  pitched.  Others at the Post-Gazette who also reposted

1   her tweet, the same policy was applied to them.  It

2   isn't a question of whether or not there is one set of

3   stories for one race of reporters and another set of

4   stories for another race of reporters.  It's really a

5   question of whether or not we can apply editorial

6   standards.  All of the cases we have cited say there is

7   a First Amendment ability to impose and enforce those

8   kind of editorial standards.

9          The case on which Mr. Cordes relies chiefly, a

10  1937 case, *Associated Press v. NLRB* went on to say even

11  though it said that general labor law does apply to

12  newspapers, which, again, we don't dispute, but it goes

13  on to say, nothing in this ruling circumscribes full

14  freedom and liberty of the petitioner to publish the

15  news as it desires and to enforce policy of its own

16  choosing with respect to the editing and rewriting of

17  news for publication and the petitioner is free at any

18  time to discharge any editorial employee who fails to

19  comply with the policies it may adopt.

20         All of the other labor cases that we talked

21  about, *Newspaper Guild of Greater Philadelphia v. NLRB,*

22  *McClatchy Newspapers v. Nelson, Ampersand Publishing,*

23  all of them affirm the ability to have those kinds of

24  editorial standards to preserve journalistic ethics and

25  the First Amendment protects them in spite of the

1    application of more general laws.

2            The one case that they rely on, a 1983 case

3    from the District of Nevada, *Hausch v. Donrey,* doesn't

4    dispute that.  That case only dealt with whether or not

5    newspapers were completely immune from any kind of

6    regulation under Title VII and that's not what is at

7    issue here.

8            What is at issue here is whether or not on the

9    day that Ms. Johnson pitched three story ideas the

10   Pittsburgh Post-Gazette had the First Amendment right to

11   decide that it would apply equally to all of its staff

12   members the same editorial standards.

13           Thank you, Your Honor.

14           THE COURT:  All right.  Thank you to both of

15   you.  Very well argued motion with several I think very

16   interesting issues.

17           Let's move on to the next motion, but before

18   we do that, why don't we take a short break here.  It's

19   about 11:30, why don't we just take about five minutes,

20   let's say 11:35 come back on the record and then we'll

21   hear from Mr. Kerr on the defendant's motion to dismiss

22   in the other case.  Let's go off the record at this

23   point in time.

24           (Whereupon, a break was taken.)

25           THE COURT:  Why don't we go back on the record

1   at this point in time.

2           Let's move on to the second motion to dismiss.

3   This one in the Pittsburgh Commission Human Relations

4   case.

5           Mr. Kerr, do you want to proceed.

6           MR. KERR:  Good morning, Your Honor.

7           I think we had about a half dozen initial case

8   management conferences by phone but I think this is the

9   first time I appeared in front of you.  It is nice to

10  see your face rather than talk on the phone.

11          THE COURT:  Same here.  Good to finally see

12  you in person.

13          MR. KERR:  May it please the Court,

14  Mr. Revere, I won't go over all the points in my two

15  briefs.  Instead, I will focus on a few issues which I

16  think are particularly significant but, first, I would

17  like to start my argument with a 30,000 foot view so to

18  speak.

19          The Post-Gazette seeks to enjoin an ongoing

20  administrative proceeding by the Civil Rights

21  Commission.  I've handled employment law cases in one

22  form or another for about 30 years, so when my partner,

23  Mr. Hark Hamilton, who is the Commission solicitor,

24  asked me to help him on this case, the first thing I

25  told him was I never encountered a case where a litigant

1    tried to stop an administrative investigation, so

2    there's probably a reason why I haven't run into that

3    issue.

4           Before I started to do some legal research, I

5    tried to figure out from a common sense viewpoint why

6    this is the first time I have bumped into this.

7           As the Court knows, the largest Civil Rights

8    Commission in the country is the EEOC.  Its website says

9    it investigates about seventy to a hundred thousand

10    charges of discrimination per year.  So when I started

11    to do legal research, I looked for a cases where a judge

12    had enjoyed the EEOC from investigating a charge because

13    the employer felt like it had a winning defense so there

14    would be no need for the investigation.

15           At first I couldn't find any cases.  I didn't

16    even find cases where employers had tried.  Then I

17    looked for cases where an employer filed a suit against

18    the state or local equivalent of the EEOC, even though

19    the EEOC and the state commissions do the same thing.

20    That's when I came across the *Ohio Civil Rights*

21    *Commission v. Dayton Christian School* case, and I'll

22    just refer to that as the *Dayton* case.  It seemed the

23    underlying logic of *Dayton* is pretty straightforward.

24    There is already a system in place to investigate

25    discrimination charges, okay.  In the *Dayton* case, it

was the Ohio Civil Rights Commission which would be the

equivalent of the PHRC here in Pennsylvania, but it

could have been the EEOC.  Under the Younger abstention

doctrine, federal courts are supposed to allow the EEOC

or its brethren state agencies to do their jobs, to

investigate cases.

          After the administrative remedies are

exhausted and if the suit is ever filed, then the

federal courts decide the employer's legal defenses.

          As this Court knows, employers routinely file

motions to dismiss and motions for summary judgment

because they always feel they have winning arguments.  I

know I do about 50 percent employment defense and every

time I defend a case, I think I have a winning argument

and usually the Court says, well, reassert it on summary

judgment.  It's not as good as you think, Kerr.

          Sometimes defense counsel wins, but they don't

sue to enjoin the EEOC or the PHRC because the

administrative charges are still at the administrative

stage.

          So it started to occur to me in effect the

Post-Gazette is seeking 12(b) relief at the

administrative remedy stage, albeit using the old saying

the best defense is a good offense.

          If that's permissible in employment

discrimination cases, there should be thousands of
reported cases where employers filed preemptive federal
1983 injunctions against the EEOC or the state agencies
because, as I said, every employer defense counsel
thinks they have a guaranteed winning defense.  I think
the *Dayton* case effectively shut that down many years
ago.  I think the Supreme Court's rationale was in large
part a practical one because it didn't want to open up a
Pandora's box that would allow employer defense counsel
to basically make Civil Rights Commissions moot.

In my first brief at Pages 5, 6, and 7, I
listed several cases where the federal courts have
abstained from enjoining civil rights investigations.
So I think it's fair to say that that is the majority
view by far.

I understand this Court is sort of a hot bench
on the abstention doctrine because it recently applied
it in a couple cases, so I'm not going to lecture the
Court on what the elements are.

THE COURT:  I will say it's amazing how many
abstention cases I get.  I don't know if I'm in the
minority.

MR. KERR:  There's tons of them, Your Honor,
tons of them.  The Commission's argument in this case,
no surprise.  It's just a straightforward eighth grade

1    civics lesson federalism defense, period.

2           State courts are supposed to enjoy the same

3    prestige and standing as federal courts.  Though there

4    are some unusual instances where a federal court should

5    enjoin a state court and though a federal court's duty

6    is to hear cases as the Supreme Court said is, quote,

7    unflagging, when the elements of the abstention doctrine

8    are met, federal court are supposed to defer to their

9    state court brethren.

10          The two most significant cases my client, the

11   Commission, relies on are the *Dayton Christian School*

12   case and the Third Circuit unreported case in *Ocean*

13   *Grove Camp Meeting Association v. Vespa-Papaleo*, and I

14   just call that *Ocean Grove*.

15          Getting back to the *Dayton* case that was

16   originally significant and is still significant because,

17   as the Court knows, it extended Younger to

18   quasi-criminal proceedings.  As the Court knows Younger

19   was originally a criminal case where defense counsel

20   made a preemptive strike against the prosecutor and then

21   in subsequent cases like *Dayton*, the Supreme Court said,

22   well, if it's quasi-criminal under these factors or

23   whatever, we are going to extend it.  The civil cases,

24   too.

25          But in the *Dayton* case, the Court was faced

1   with facts very similar to the case we're dealing with
2   today where plaintiff filed a 1983 complaint alleging
3   violations of her First Amendment rights.  As I said in
4   my brief, *Dayton* is particularly applicable because
5   that's what the Post-Gazette is trying to do here.
6          I'm never overly confident about any case but
7   to be frank, it's always nice to start your case off
8   when you have a United States Supreme Court opinion that
9   is pretty close on its facts.  It's a good way to start.
10         Then years later in the *Ocean Grove* case
11  decided in 2009, the Third Circuit summarized the often
12  cited elements of the Younger abstention doctrine as
13  updated later in the *Middlesex* case, and I said I wasn't
14  going to lecture the Court, but I just want to go over
15  this quote from *Ocean Grove* because it concisely lists
16  the elements and then I'm just going to hit a couple of
17  the elements that I think are particularly relevant.
18         In *Ocean Grove*, the Court said, quote, Younger
19  abstention is appropriate when, one, there's a pending
20  state proceeding judicial in nature; two, the proceeding
21  implicates important state interests; and three, there's
22  an adequate opportunity in the state proceedings for the
23  plaintiff to raise its constitutional challenges, and
24  then the Court cites *Middlesex*.  That updated Younger.
25         Then the *Ocean Grove* Court goes on to say,

1    When all three of these factors are met, abstention is

2    proper unless -- these are the two exceptions -- one,

3    the state proceedings are being undertaken in bad faith

4    or for purposes of harassment; or two, some other

5    extraordinary circumstances exist such as proceedings

6    pursuant to a flagrantly unconstitutional statute such

7    that deference to the state proceeding will present

8    significant immediate potential for irreparable harm to

9    the federal interest asserted.  Okay.

10            Obviously, in this case, Your Honor, the

11   Commission believes that all three of the elements of

12   Younger, Middlesex are met and neither of the two

13   exceptions are met.  So I'm going to focus on a couple

14   of these elements that I think bear a closer scrutiny

15   today.

16            No. 1, is there a pending state proceeding

17   that is judicial in nature?  We believe that the first

18   element has been met because there is a pending state

19   proceeding that is judicial in nature.

20            In their brief, the Post-Gazette asserts that

21   because the only apparent docket activity before the

22   Commission is a complaint, a formal complaint that was

23   filed and served and then the Post-Gazette filed a

24   verified answer in new matter and also filed a position

25   statement, but at that point then the suit was filed.

1           Now whether or not that's a judicial

2    proceeding, I don't mean to be frivolous, but one only

3    has to use the duck test to determine there's an ongoing

4    judicial proceeding.  The Commission's complaint is

5    procedurally identical to a complaint filed before the

6    Pennsylvania Human Relations Commission, which is its

7    statutory equivalent.

8           Moreover, the Post-Gazette's verified answer

9    in new matter is obviously a responsive pleading in a

10   judicial proceeding.  In fact, the authority that the

11   Post-Gazette relied on when it filed its answer in new

12   matter is Rule No. 4 of the Commission's Rules of Civil

13   Procedure which provides for an answer to be filed

14   within 30 days and also allows for a position statement.

15          That same Rule of Civil Procedure, No. 4,

16   provides for amendments to pleading, motions and briefs.

17   So if you just use the duck test, there's a judicial

18   proceeding going on.  I'll address later how the

19   Post-Gazette tries to analogize this to a case that said

20   it's just an audit letter, that's not enough to be a

21   judicial proceeding.

22          You don't put a caption on the top of an audit

23   letter, you don't file an answer in new matter verified

24   by the defendant in an audit letter.  So, again, using

25   the duck test, I don't really think that is that much of

1  a question here.

2        Now the Post-Gazette specifically tries to

3  distinguish this first element away by arguing that

4  since the Commission's procedures in two phases, first,

5  investigative phase, where we're at, and then in the

6  adjudicative phase after a formal finding of probable

7  cause, the Post-Gazette is saying, well, because we are

8  not at the adjudicative phase yet, a judicial proceeding

9  hasn't begun, but this specific issue was addressed in

10  great detail in the *Ocean Grove* case where the

11  administrative proceeding was the exact same.  It was in

12  the same two phases.  The Court held that from the

13  minute the complaint is filed, the entire process is

14  judicial in nature.  I know it's never exciting when

15  quotations are read but I think I'm going to read from

16  *Ocean Grove* and it pretty much nails this down.

17        The Association argues that the first

18  requirement of Younger is not met because the early

19  stage of the DCR proceedings are investigative, not

20  adjudicative and, therefore, do not amount to

21  proceedings that are judicial in nature.  The

22  Association notes that the administrative process at

23  issue in this case is divided into two stages.  An

24  investigatory period after which the DCR makes a

25  probable cause finding and an adjudicatory period during

1    which a hearing is conducted before the administrative

2    law judge.

3           The Association contends that the

4    administrative process is not, quote, judicial in nature

5    under Younger until a probable cause finding is made and

6    the case is transferred to the judge.

7           Here, conversely, the Association notes that

8    at the time the federal suit was filed, the DCR had not

9    even begun its investigation.  The Association does

10   attempt to distinguish this case from the Ohio Civil

11   Rights Commission, that's the *Dayton* case, in which the

12   agency had made a finding of probable cause prior to the

13   filing of the federal court action, and there's a cite

14   to *Dayton*.

15          Because we conclude that the DCR proceedings

16   are judicial in nature from the point that a complaint

17   is filed, we reject the Association's argument under

18   Younger's first requirement.

19          Then the Court goes on to talk about the

20   system that's laid, the administrative procedure system

21   laid out in the *Ocean Grove* case.  It's standard

22   administrative law.  It's almost identical to the same

23   administrative procedure in the Pittsburgh Commission's

24   Rules of Civil Procedure.

25          Then the Court concludes its holding on this

1    aspect by saying, Considering this elaborate statutory

2    scheme for addressing civil rights complaints, we must

3    agree with the district court that there simply can be

4    no question that the DCR proceeding as a whole is

5    judicial in nature.  The Supreme Court has recognized

6    that Younger abstention applies to proceedings conducted

7    by civil rights agencies, cites *Dayton*, and that

8    administrative proceedings can be judicial in nature

9    from the moment a complaint is filed.

10          Significantly, the Third Circuit cites

11   *Middlesex* for that proposition.  Now I'll come back to

12   *Middlesex* in a second.

13          Just to conclude the quote from *Ocean Grove*,

14   the Court says, the DCR proceeding in this case is very

15   similar to proceedings in Ohio Civil Rights Commission

16   and in Middlesex County Ethics Committee and is judicial

17   in nature from its inception.  Notably, when a complaint

18   is filed with the DCR, the agency launches a prompt

19   investigation that is akin to the discovery period of

20   federal court and if at the end of the investigation the

21   DCR finds probable cause, a trial-like hearing is held.

22   We conclude that this entire process is judicial in

23   nature and prong one of Younger is met.

24          Now in the Post-Gazette brief they are

25   obviously concerned about this opinion and so they

1   distinguish it and I'm not making light of them.  I

2   would have done the same thing.  They try to distinguish

3   it by saying, well, *Ocean Grove* is an unreported case,

4   and I get that, but *Ocean Grove* is very persuasive.

5   It's been cited I think 20 or 30 times not only by Third

6   Circuit Courts but by courts and other jurisdictions;

7   and significantly, it's never been distinguished or

8   criticized but, again, it cites *Middlesex*.

9           In *Middlesex*, that was a case where an

10  attorney committed an ethics violation allegedly.  The

11  Ethics Committee filed a complaint, an ethics complaint,

12  and the system looked pretty much similar to the

13  Pennsylvania Disciplinary Board.  Instead of answering

14  the complaint, the plaintiff Middlesex filed a 1983

15  injunction alleging violation of the First Amendment

16  rights.  It was an attorney who had said some very

17  unflattering things about a judge that he was trying a

18  case in front of, and the Ethics Committee said you are

19  not supposed to criticize a standing judge and so they

20  brought him up on charges.  The attorney defended

21  saying, no, that's a violation of my First Amendment

22  rights.  I'm allowed to criticize the judge if I want

23  to.

24          In the *Middlesex* case, the Court said that the

25  judicial proceedings started upon the filing of the

1    ethics complaint.  So I am making a big deal out of

2    *Middlesex* even if this Court does not give full weight

3    to *Ocean Grove* because it's an unreported case, if you

4    trace back its source, it goes back to *Middlesex* which

5    is a Supreme Court case.

6              Last on this topic, I will also point out a

7    federal judge in West Virginia in 2019 drilled down on

8    this same question.  I didn't cite this in my brief.  I

9    apologize.  I didn't find this case until yesterday.  I

10   did the last minute Shepardizing of the cases I cited

11   just to see if there was new cases and that's the first

12   time I came across this one.  It's called *Durstein*,

13   D-u-r-s-t-e-i-n, and the Westlaw cite is 2019 Westlaw

14   6833858.

15             In *Durstein*, it involved a high school teacher

16   who had tweeted some, for lack of a better term, Islamic

17   phobic tweets on her Twitter account and she posted a

18   meme picture of President Obama calling him a, quote,

19   Muslim douchebag.  So the school sent her some charges

20   and said we are going to investigate you.  She filed a

21   1983 claim and her lawyer made the same argument that

22   the Post-Gazette is making that since this is a

23   pre-probable cause situation, Younger doesn't trigger.

24             So, significantly, the West Virginia court

25   thought that the *Ocean Grove* case from the Third Circuit

1   was so persuasive it cited that.  Again, I'll read this

2   quote and I'll be done with this issue.  Last quote I'll

3   bore you with, Judge.

4          Quote:  Even if the hearing is judicial in

5   nature, Durstein argues abstention is inappropriate

6   because the Department of Education is not called a

7   hearing.  The agency is only investigating whether to

8   hold one.  Durstein relies on two Fourth Circuit cases

9   but neither are instructive here.  I'll skip over the

10  distinguishing of the Fourth Circuit case.

11          But in contrast, the Department of Education

12  made it clear that its investigation will decide whether

13  a hearing is warranted and the Department has provided

14  Durstein with the contact information of her

15  investigator to stay informed.  To split the

16  Department's process into two separate investigative and

17  adjudicative proceedings, as Durstein argues, would

18  effectively eliminate Younger by allowing plaintiffs to

19  file in federal court as soon as an investigation is

20  announced.  The court, therefore, concludes that the

21  Department's investigation and hearings are two phases

22  of the same proceeding, and that's why I'm quoting this.

23  Conceptually it makes sense.

24          Then the Court cites *Ocean Grove* and it cites

25  another case, which I apologize, I didn't find, pretty

1    much holding the same thing.  It's a reported Sixth

2    Circuit opinion from 2008.  It's called *O'Neill*, and

3    that's at 511 F.3d. 638 that's reported Sixth Circuit

4    case.  The parenthetical comment says, quote, holding

5    that filing and investigation of grievance is part of

6    the state's judicial proceeding.

7              So with regard to the first prong, I don't

8    really think it's a close question.  I hope I haven't

9    beaten it to death but, again, if you just go back to

10   the duck case, look at the caption of the complaint,

11   look at the answer in new matter, we are in a judicial

12   proceeding.  So I kind of think, to use an old lawyer's

13   phrase, it's beyond catapulted.  The first prong of

14   Younger is met.

15             To get back on track here.  Last, I'll point

16   out although we're still at the complaint phase, this is

17   a special complaint, Your Honor.  Most complaints, as

18   the Court knows, whether it's in front of the EEOC or

19   the PHRC or City Discrimination Commission is initiated

20   by a private complaint; but just like the EEOC can

21   bring, for lack of a better term, a class action, okay,

22   the PHRC and the Pittsburgh Commission can do the same

23   thing and there's a special rule for that in the

24   Pittsburgh Commission's Rules of Civil Procedure.  So

25   that's what was followed here.  There were no names

1   mentioned.  It's kind of a mini class action, but there

2   is a rule of procedure that authorizes that.

3         My point is if you read the rule, and I cited

4   this in my brief, before a Commission complaint is

5   filed, the investigative committee has to do a vetting

6   process.  In other words, it's not like an EEOC charge

7   where anybody can just walk in and say I want to file a

8   charge, there may be zero merit to it, there was no

9   vetting.  You go in there and tell the EEOC you want to

10  file a charge, they'll let you file a charge and then

11  they'll figure if there is no merit, it will be vetted

12  through the system.

13        Is it officially beyond the probable cause

14  stage, no, but it kind of is because it was already

15  vetted.

16        Now, another way PG attempts to distinguish

17  that is with the recent Third Circuit case *PDX North v.*

18  *New Jersey Department of Labor.*  That's mentioned in

19  their brief.  Full disclosure.  At the time the PG cited

20  that, it wasn't reported.  It is since a reported case.

21  There is a Third Circuit case, so it's precedent but I'm

22  not concerned about it because it's easily

23  distinguishable on its facts.

24        There were two plaintiffs.  PDX wasn't one of

25  them.  The other one I think the initials were SLS, and

that's the one that got out on the Younger prong.  Their
winning argument was, well, the only, quote, complaint
they got was an audit letter.  They got an audit letter
from the agency saying they did some predatory lending
and whatever, and the SLS lawyer said, well, we don't
think you are in a judicial proceeding yet because it's
just an audit letter, and the Third Circuit agreed.
Well, that makes sense.

That's a far cry -- a simple audit letter is a
far cry from a formal complaint.  I understand why the
Post-Gazette cited that, but factually, I don't really
think that carries much weight.

The only case that I found where a court did
enjoin a discrimination investigation and the
Post-Gazette cited this in their brief is a case called
*LA Debating*.  It's a Fifth Circuit case from 1995.  I
think that's the only time, at least that I found, that
a court enjoined a discrimination commission but that
case is easily distinguished from the facts in this
case.

The defendant in this case was the City of New
Orleans and if you read the opinion, the City never even
raised this argument.  The Court raised it on its own
and kind of hinted the City's lawyers weren't too smart.
They should have said, hey, first prong of Younger isn't

1   met.

2            The Court gave that quite a bit of weight,

3   even though, as the Court knows, you can raise

4   abstention sua sponte, the Court gave it a lot of weight

5   because the Court said, well, we'll take this into

6   consideration.  They didn't think it was that important.

7            Secondly, the City of New Orleans for some

8   reason waited five months before it ever raised

9   abstention and during that five months, did zero on the

10  investigation.  That's another factor that the Fifth

11  Circuit took into consideration when they decided to

12  enjoin the Commission.

13           Well, obviously that didn't happen in the

14  Pittsburgh Commission's case because as soon as the

15  complaint was filed, we immediately filed a motion to

16  dismiss asserting the abstention doctrine and even

17  though we haven't done an investigation, as I said in my

18  brief, when defense counsel and I talked about that and

19  they made that request to hold things off until this

20  Court made its decision, I said, okay, let me talk to my

21  client.  I'll recommend just out of comity we'll do that

22  but I don't want you to turn around to use that again

23  because I had already found the *LA Debating* case and I

24  didn't want to shoot myself in the foot.

25           So defense counsel entered that stipulation

1   and when we had the initial case management conference
2   before this Court, and I know you had a lot of them,
3   Judge, and you probably don't remember, but I do, I
4   brought that up again and I said, hey, Judge, I just
5   want you to know we entered into a stipulation but I
6   don't want you to hold that against me.  I don't know if
7   we were on the record or whatever, but I think you said
8   sure, no problem.  Okay.
9           There are other ways to distinguish *LA*
10  *Debating*, a low hanging fruit way of distinguishing it.
11  You can say, well, it's an old case, it's 1995, and it's
12  in direct contravention to *Ocean Grove* and *Durstein* and
13  arguably, I think it's in direct contravention to
14  *Middlesex* so it probably shouldn't have been decided
15  that way anyway.
16          So as far as whether or not there is an
17  ongoing proceeding to get to first base under Younger, I
18  think clearly we are there.
19          The second prong I would like to talk about is
20  whether the proceeding implicates important state
21  interests.  Well, the *Dayton* case specifically held that
22  generically investigating a civil rights complaint
23  implicates important state interests period.
24          So in some of the Younger cases, the Court
25  looks at whether or not the interest being implicated is

1   big enough of a deal to trigger abstention.  Well, that

2   was decided a long time ago by *Dayton*.

3          The Post-Gazette I think in their briefs

4   attempt to distinguish this by recasting the

5   Commission's investigation.  They're saying, well, there

6   is not an important state interest because we have a

7   winning defense because there was no tangible employment

8   action, et cetera, et cetera.  I think that's a

9   distinction without a difference but I would like to

10  address that.

11         Where my client's case is different from

12  Mr. Cordes' case is we're not looking for a decision on

13  the merits of the Commission's complaint.  As I said at

14  the beginning of my argument, I think what the

15  Commission is doing is they are trying to attack the

16  merits of the complaint.  They are effectively making a

17  12(b) motion.

18         We don't know how the investigation is going

19  to come out, Your Honor.  Post-Gazette raises very

20  interesting First Amendment issues.  They may prevail.

21  They may convince the Commission we are going to back

22  off.  Talk about -- I think Mr. Corn-Revere asked the

23  Court to take judicial notice of what is on the

24  Internet.  Well, if you look at the EEOC's website, it

25  says that nationwide, 97 percent of all the EEOC charges

1    end with no decision and the Court has seen this.  The

2    EEOC just sends out the standard letter that says we are

3    concluding the investigation with no decision and here

4    is 90 days.

5              If you look at statistics of the PHRC or the

6    Pittsburgh Commission, that's the usual trajectory.

7              So what PG wants to do, they want to litigate

8    the merits now.  I don't know, maybe this case will turn

9    out where the Post-Gazette or the Commission will say,

10   well, we are going to do what the EEOC and the PHRC

11   does.  We are not going to come up with any decision.

12   If you want to appeal this and go to court or whatever,

13   you can do that, but that's generally the trajectory;

14   but even if probable cause is found, okay, the

15   Post-Gazette has all of its First Amendment rights.

16             So, again, I don't think it's the proper

17   analysis to address the same substantive First Amendment

18   rights that the Post-Gazette is making in Mr. Cordes'

19   case and apply that here because all we are doing is we

20   are just looking at the procedure.  Again, I don't know.

21   Maybe the Post-Gazette will convince the Commission that

22   there is no case.  They have already submitted I think a

23   126-page position statement and made some very, very

24   interesting arguments, but before the Commission could

25   get around to deciding whether those arguments held

1    water or whatever, we were hit with this lawsuit.

2         So, again, I start off with the practical

3    argument, every defense counsel is going to want -- an

4    employment defense counsel is going to want the dream

5    scenario of killing the EEOC charge or the PHRC charge

6    or what's the Latin phrase, ab ovo.  Well, if we are

7    going to go down that road, all the Commissions are

8    going to become moot.  We are just going to move that

9    12(b) litigation down to the Commission and that's not

10   what the systems are designed to do.

11        I'm not sidestepping the First Amendment

12   arguments.  I can meet them substantively but I just

13   don't think that's the proper analysis.

14        THE COURT:  Let me ask you this.  I don't know

15   if it bears on prong two or three, it might touch on

16   both of them, but as I understand the Post-Gazette's

17   argument, it's almost like I guess a subject matter

18   jurisdiction type of argument that I would equate it to,

19   which is that by simply initiating this investigation,

20   you're violating the Post-Gazette's First Amendment

21   rights so, therefore, by going through with this

22   proceeding, they have already lost some of the immunity

23   to which they are entitled.

24        I guess it fits more maybe the third prong

25   here, and, therefore, they are not going to have an

1   adequate opportunity to really raise their First

2   Amendment argument.  They lost it because they lost it

3   at the outset.

4          I guess I'm jumping ahead maybe to the third

5   prong more than the second but I think they tie together

6   a little bit in that respect.

7          MR. KERR:  They do.  Your Honor, I got a short

8   answer for that and then I got a long answer.  I'll give

9   you the short answer for that first.  The short answer

10  is the courts have already addressed that.  I'll read

11  from again *Ocean Grove*.  Before I do, let me point out

12  what they're complaining about is the First Amendment

13  and so this is an abstention case subset First

14  Amendment.  The *Ocean Grove* case wrote, and I'll read a

15  very short paragraph.  It said:

16          First, the DCR's exercise of its statutory

17  mandate to investigate discrimination cases cannot be

18  construed as bad faith and the Association has not

19  demonstrated the DCR has conducted itself in a manner

20  that shows any disrespect or disregard for federal laws.

21  Similarly, the Association did not establish the

22  existence of extraordinary circumstances.

23          I know that kind of jumped the gun, too,

24  because that's one of the exceptions, and I'll address

25  that, but this quote is all sandwiched together.

1          This exception does not apply any time there
2    is a chilling effect on the claimant's exercise of
3    constitutional rights.  Significantly, it cites Younger.
4    Here is a famous quote from Younger that pops up I think
5    it was about 50 times yesterday in different cases.
6    Again, abstention subset First Amendment defense.  Quote
7    from Younger:  The existence of a chilling effect even
8    in the area of First Amendment rights has never been
9    considered a sufficient basis in and of itself from
10   prohibiting state action.
11          Okay.  So it seems a rather monolithic
12   analysis but every time this question comes up when
13   somebody is in the same position as the Post-Gazette and
14   they are filing a 1983 case and they are trying to
15   enjoin an underlying investigation, whether it's by a
16   Civil Rights Commission or a lot of these cases come up
17   in Children Youth Service Commission, I think two times
18   Younger comes up more frequently is either a criminal
19   case or a CYS case, but if what they are complaining
20   about, and I don't want to say just First Amendment
21   rights because I think the First Amendment is pretty
22   important, but if they are complaining about First
23   Amendment rights, you always see this Younger quote.
24          So it seems like Younger and the cases that
25   followed this have adopted a pretty rigid rule.  That

1    seems kind of harsh.  What are some of the exceptional

2    circumstances because obviously, you have that exception

3    and I think in the Post-Gazette's brief they mentioned a

4    case, it's like their last defense.  They are saying,

5    well, all right, if the Commission can establish all

6    these Younger exceptions or these Younger criteria,

7    we'll use and I'll call it the exceptional circumstances

8    case.

9            Judge, if you look at all those, they either

10   involve facts where the plaintiff is in jail, you can't

11   unring a bell if you have been sitting in jail for a

12   long time, or life and limb, physical life and limb are

13   at stake.

14           There are a couple cases.  There is a case

15   that the Post-Gazette didn't cite.  I thought I would

16   see it in their brief.  It's called *Addiction*

17   *Specialists* where a plaintiff won on that on

18   extraordinary circumstances, call it irreparable harm,

19   whatever.

20           That case involved a denial of a permit to

21   keep a rehab clinic open.  So the court said people

22   could die.  If we shut this clinic down, you can't

23   unring death.

24           So where the cases seem to line up, if you're

25   saying like the Post-Gazette just going through this is

1   going to violate my rights, even if I win, it's too
2   late.  My rights will be violated.  If it's First
3   Amendment, the Court has already decided that.
4         Again, the Court -- Younger and the federal
5   courts aren't saying the First Amendment rights aren't
6   important.  What they are saying is you want to complain
7   about First Amendment, fine, you may win on the First
8   Amendment issue but you got to do that in state court
9   under federalism.  We'll give you an exception to do
10  that if time is ticking away and you may die before you
11  litigate that in state court or you may sit in jail.
12        Again, I'm not trying to make that simplistic
13  or monolithic but that language keeps coming up again
14  and again.  If you look at that string cite I have on
15  Pages 5 and 7 about all the times where other plaintiffs
16  have done the same thing as the Post-Gazette, they tried
17  to shoot down a discrimination investigation asserting
18  the First Amendment, you see that language all the time.
19        The only case I could find where somebody was
20  successful in doing that was the *LA Debating* case and I
21  already distinguished that.
22        Tied into that is the question of will they
23  get meaningful due process.  Your Honor, I'm
24  representing a government entity and you dealt with the
25  government before.  They're interested in maintaining

the integrity of their system.  They'll go to court
because they believe in their rules and regulations,
they believe in their system, they believe they have a
fair system.  That's what we're doing there.

We're saying just because we are a state
court, we're not a federal court, just because we are a
state court system, we have a good system.  You may get
the relief that you want but you shouldn't condescend us
and just assume because we are a state court we are not
going to be able to adjudicate questions like the First
Amendment.

This dovetails into the Post-Gazette's other
argument where they are saying our system cannot fully
vindicate First Amendment rights.  Well, let's go back
to *Middlesex*.

In *Middlesex*, the attorney made that same
argument.  The attorney said, well, I have good
complicated First Amendment issues here.  You are saying
I can't stand on the street corner and bad mouth the
judge, whatever, I think it's appropriate to defend my
client, that's very, very important.

If I'm going to go in front of an ethics
committee, that's not a real judge.  Those are not real
judges.  They are not going to understand these esoteric
First Amendment arguments and the Supreme Court said no.

1    Let's look at your system.  You are going to go in front

2    of a board.  A lot of the people on the board are

3    attorneys.  Do not presume that they cannot understand

4    constitutional issues.  You can make those defenses.

5    You may win before the Ethics Committee.  If you don't,

6    then you get into the court system and appeal that.

7              That's one of the defenses the Post-Gazette

8    asserted in their brief.  They are saying, well, we

9    can't meaningfully assert our First Amendment editorial

10   discretion defenses in front of the Pittsburgh

11   Commission.  Well, let's look at the actual system.  If

12   you look at the rules of procedure, here is how it would

13   work out.

14             I'm into the last section of my second brief

15   where I said, okay, let's put the case law aside and

16   let's just look at the nuts and bolts, let's look at how

17   this would play out if the Court denied the request for

18   an injunction and we went to court.

19             The Post-Gazette has a ton of due process

20   rights off the bat.  If the investigator wanted to ask

21   the Post-Gazette a question that they felt it was out of

22   bounds because it infringed on the editorial expression,

23   the first option the paper has is to say, I don't want

24   to answer that.  I think that's First Amendment.  We're

25   not going to answer.  Then the ball bounces back to the

 1  Commission.  What's the Commission going to do?  The

 2  Commission may say, okay, I'm not going to push the

 3  issue.  I have seen enough.  We are just going to go

 4  ahead and dismiss the case or we'll make a decision but

 5  I'm not going to push the issue.

 6          So it may be a moot point or let's just say

 7  the investigator said you know what, you are using

 8  editorial discretion as a defense not to answer the

 9  question.  I think I need that.  The investigator could

10  ask for a motions commissioner to be appointed by the

11  committee.  A Motions commissioner would be the

12  equivalent of an administrative law judge at that stage.

13  Then the Post-Gazette could make all the arguments.

14  They could say, well, here is the 127-page position

15  statement we read and this is why we don't think we need

16  to answer that question.  The Post-Gazette may win and

17  they could win very easily.  The motion commissioner

18  could say yes, that's protected information.  You don't

19  have to answer that and then the investigator would have

20  to make the decision.

21          The Post-Gazette would have another chance of

22  asserting their First Amendment defense at the public

23  hearing.  They could make that same motion and they may

24  win there or if it gets appealed to a Common Pleas

25  Court, a Common Pleas judge in Pennsylvania can decide

1   the same First Amendment case law that a federal court

2   could do; but for the Commission to just say we don't

3   even want you to ask the question, our First Amendment

4   right is so sacrosanct, we don't want the hassle of even

5   asking the question.

6          I understand why you didn't want to say that,

7   but that gets you right back into Younger where Younger

8   says if your reason for getting out of abstention is the

9   First Amendment, that never has been a basis alone.

10  Nobody is dying, nobody is in jail.

11         It seems like I'm being inconsistent.  It

12  seems like I'm poo-pooing the significance of the First

13  Amendment.  No.  The First Amendment is a very important

14  amendment and I respect the rights of the newspaper but

15  that's not enough to get you out of the abstention

16  doctrine.  All that does is you get that question moved

17  to the state courts.

18         Let me talk about moving forward.  I don't

19  know how the Court is going to rule but if you rule in

20  our favor, we are asking you to dismiss the case; and as

21  you probably know, if you grant our abstention motion,

22  it's dismissed without prejudice.  The Court also has

23  discretion to stay the litigation.

24         Now, how would that actually work out?  Well,

25  if you granted our motion and you abstained, I don't

1    think you'll ever see this case again, Judge, and here

2    is why.  No. 1, I think there's a great chance that this

3    is going to be resolved.  The First Amendment issue is

4    going to be resolved either at the Commission level or

5    the Common Pleas level.

6              No. 2, the Commission may decide you know

7    what, there is no case here.  I heard Mr. Corn-Revere

8    make very interesting arguments about there is no

9    material adverse action or whatever.  He may prevail at

10   that, the Commission.  The Commission may look at that

11   and say you know what, we just don't think there is

12   anything there.  So the First Amendment rights aren't

13   even ripe.  They won at the merits but at the Commission

14   level, not in federal court.

15             Let's just say for whatever reason, this goes

16   to Common Pleas Court and then it gets appealed to the

17   appellate court.  The Post-Gazette's First Amendment

18   defenses will be adjudicated, and you know what, Judge,

19   there will be collateral estoppel.

20             If you read the line of cases of abstention

21   and 1983 moving forward, they almost never come back to

22   federal court because somebody is going to win that

23   First Amendment issue, either the Commission is going to

24   win or the Post-Gazette is going to win, and they're

25   going to know that's collateral estoppel.  So the cases

1  either are going to go away or be settled because even

2  though it's in state court, the Court knows that

3  collateral estoppel will apply in federal court.  So

4  that's the normal trajectory.  That's why you don't see

5  these cases -- if you read the cases, you don't see them

6  coming back to federal court because the decision is

7  made and that decision is binding.  You know what, the

8  Post-Gazette may win.  They may win the First Amendment

9  issues if things don't get worked out early on and it

10  goes down the line.  They may win or they may lose.

11        If they lose, they are not going to go back to

12  federal court because they know the Post-Gazette would

13  use collateral estoppel.  If they win, the Commission is

14  going to be faced with that collateral estoppel.  My

15  point is it gets worked out.

16        I understand they don't even want to be

17  bothered by the investigation at all.  They don't want

18  to answer any questions.  You know what, Judge, every

19  single employer that receives a charge of discrimination

20  from the EEOC or the PHRC or Pittsburgh Commission, they

21  feel the same.  You know what, we shouldn't even have to

22  be defending this.  This is going to be a distraction.

23  Why should we have to pay our lawyers.  So to that

24  extent, the Commission is making the same argument that

25  every other employer makes.  The only difference is they

1   are using a different type of defense but, again, this
2   takes us back to Younger.  It says if the only thing you
3   are going to assert is the First Amendment, that's not
4   the type of defense that gets you out of Younger.  You
5   may win on that in state court but we are not going to
6   let you out of the abstention doctrine because nobody is
7   dying and nobody is in jail.

8           That's all I have, Your Honor.

9           THE COURT:  I have one question, maybe a bad
10  question because I don't know yet if it's relevant at
11  all before the motion before me.  The complaint by the
12  Commission seems broader than the potential First
13  Amendment defense that the Post-Gazette would raise.  I
14  think it's not so much -- it doesn't go only to -- I
15  could be wrong, but I think this is how I read the
16  complaint.  It doesn't go only to the Post-Gazette's
17  exercise of its editorial judgment with respect to
18  Ms. Johnson and her tweet but it also alleges that a
19  number of other Post-Gazette employees were retaliated
20  against for their support of Ms. Johnson, something
21  which I think is maybe -- maybe the Post-Gazette would
22  argue that, too, is protected, but under the First
23  Amendment, but at first glance, it seemed to be
24  potentially outside of that First Amendment argument.

25          So assume that is the case and it's outside of

1   a maybe First Amendment defense, I'm just trying to

2   think does that matter?  Is it relevant here for

3   purposes of Younger?  It may not be but it's something

4   that aided me a little bit.

5           MR. KERR:  I don't think it changes the

6   Younger analysis at all, Your Honor.  I have the

7   complaint in front of me but from a practical

8   standpoint, it's very relevant because that's what got

9   the Commission fired up.

10          They looked at this as basically witness

11  intimidation.  When I spoke with the director, this is

12  not on the record but it will come out in discovery, I

13  said you seem to be saying that the Post-Gazette had

14  sort of this mass retaliation against everybody that

15  stuck up for Ms. Johnson.  How many reporters are we

16  talking about.  I thought they were going to say four or

17  five and they said 60.  I went, oh, that's a lot.

18          I don't see a lot of class action-type

19  complaints.  Not to be reductive, but the Commission

20  thought this was a really big deal and that's why they

21  used rather an extraordinary remedy of bringing a class

22  action complaint because they thought they had to

23  protect their system.  They thought, you know what, if

24  an employer is allowed to obstruct an investigation and

25  send word out, if the investigator wants to ask

1 questions about why was this employee discriminated

2 against and all the witnesses are going to be

3 intimidated, then the whole system is going to break

4 down.

5        The Commission almost felt like they were in

6 the defense mode, they had to protect the system and

7 that's why they filed this complaint.

8        As far as the merits of that, that should be

9 worked out at the Commission level.  Maybe the

10 Post-Gazette will win everything.  Maybe the

11 Post-Gazette will say this is all a misunderstanding, or

12 yeah, we agree with your 127-page position statement.  I

13 don't know if they are going to win or lose at the

14 Commission level.

15        Again, I'm representing a government entity.

16 I want to make my system work.  Let us work that out.

17 We got a good system.  We're very proud of it.  We have

18 professionals that work there.

19        As I said in my brief, I bragged about how

20 good our system is with the rules that are recently

21 updated.  We are proud of our system and this is an

22 attack against our system.  This is basically saying you

23 guys are just little people, you don't know how to

24 handle First Amendment issues, you are not really

25 important, we are going to take our case to federal

88

1    court and we're going over your head.  Of course, the

2    Commission is not going to feel good about it.  So I

3    guess that's why we're here.

4          THE COURT:  I guess as I'm thinking, again, I

5    would want to hear from Mr. Corn-Revere on this, whether

6    or not the Post-Gazette would take the position that

7    their First Amendment defenses would apply to the

8    separate issue of whether or not employees were

9    retaliated against for supporting Ms. Johnson or

10   speaking out against Ms. Johnson versus the issue of the

11   Post-Gazette's decision to not allow Ms. Johnson to

12   write certain stories that she tweeted on.

13         If the First Amendment defense doesn't apply

14   to the 60 other employees and what has motivated the

15   Commission to get involved is the 60 other employees I'm

16   just thinking from a practical matter, why doesn't the

17   Commission just kind of sever out the Johnson tweet

18   issue, let that proceed in an ordinary course of an EEOC

19   type of claim brought by Ms. Johnson and then focus

20   more -- I don't run the Commission but I'm just sort of

21   thinking about --

22         MR. KERR:  You took the words right out of my

23   mouth.  The Commission may do that, but, again, you are

24   right into abstention.  That is something the Commission

25   should do.  Again, the Post-Gazette may win on all these

1  issues.  That's why I keep saying what they are doing,

2  they are trying to make you the Commission.  That wasn't

3  a Freudian slip on the Court's part.  That is exactly

4  what they are trying to do.

5          We don't know what we don't know.  Questions

6  like were there material adverse actions against some of

7  these 60 people.  We don't know because we got stopped

8  in our tracks.

9          Try filing a 1983 injunction against the state

10  police or the FBI when they are in the middle of their

11  investigation and asking for their work product.  That's

12  a criminal defense counsel's dream scenario.  I guess

13  any good criminal defense counsel could get a jury

14  acquittal but it takes a really good one to prevent his

15  client from ever being investigated.  That is why the

16  Younger case came along and that is why the courts are

17  universally hostile against this collateral attack or

18  preemptive strike coming down on the head of the state

19  troopers or the FBI or any of these agencies.

20          They're saying you know what, let us do our

21  investigation first.  Maybe you will be exonerated.

22  Maybe we won't even charge you but basically to obstruct

23  our investigation, I don't mean to use a pejorative word

24  but that's really what they are doing, they are

25  obstructing our investigation.  So we're saying maybe

1  you are jumping the gun.  Maybe there is nothing there.

2  Let us do our job and investigate this.  You will have

3  all the opportunity to serve all your defenses but you

4  can't kill our investigation or we will be out of a job

5  and that's really where we are at, Your Honor.

6          Getting back to the 30,000 foot level, my

7  client has kind of like macro concerns, like, holy

8  mackerel, if we lose this, what that is going to say is

9  any time there is a complaint by an employee of the

10  newspaper, that's hands off.  We already got burned in

11  the Post-Gazette case, and we are just not going to take

12  complaints by people at newspapers because the

13  Post-Gazette kind of set a precedent they are going to

14  file a 1983 case or whatever.

15          I don't know if those global or macro issues

16  are before the Court but that's my client's concern.

17  That's why I said kind of in an almost over general

18  manner at the beginning of my first brief, I said I

19  think what the Post-Gazette is trying to do is they are

20  trying to carve out a blanket immunity exception similar

21  to the *Hosanna Paper* cases and things like that.

22          Maybe the United States Supreme Court will

23  eventually grant newspaper organizations such broad

24  relative immunity from employment discrimination cases.

25  That hasn't happened yet and I don't think these facts

1   would support this being the test case for doing that.

2          I don't know if the Post-Gazette has some

3   larger agenda or whatever to make good case law but not

4   on these facts.

5          So I think I'll shut up right now.  Judge, I'm

6   talking too much.

7          THE COURT:  Thank you.  Very helpful.  I

8   appreciate it.

9          Mr. Corn-Revere, do you want to respond?

10         MR. CORN-REVERE:  Yes.  Thank you, Your Honor.

11  Again, I will try not to take too much time.

12         First of all, I want to say just a couple

13  things.  One, I appreciate Mr. Kerr's position.  It's

14  well stated.  I want to assure him and the Commission

15  this case is not filed out of disrespect to the notion

16  that the agency or state courts can't function, rather

17  that this is not an appropriate case to proceed.

18         As we tried to work out in advance, this is a

19  unique case for a couple of reasons, and one of them

20  first pertains to Younger because of the unique posture

21  of the case.  It isn't just the 1983 case with the PHRC

22  but the 1981 case is already going to be heard by the

23  court, the First Amendment issues are already before the

24  court.  So the concerns about duplicative state and

25  federal action, the concerns about comity are to a large

1    extent mitigated because those issues are already before

2    the court.  They are going to be decided.  We can

3    discuss later on to the extent to which they overlap and

4    be dispositive but in any event, you don't have the

5    concerns in this case about respect for state procedures

6    that you have in one of the Younger cases where you

7    don't have parallel cases involving the same set of

8    facts, involving some of the same constitutional issues

9    or all of the same constitutional issues that are

10   already before the court and are teed up for a decision.

11          I appreciate the fact that Mr. Kerr says we

12   might well prevail on the First Amendment part of the

13   case.  I'm hoping we will, but in that case, to whatever

14   extent the Court focuses on those issues, the 1981 case,

15   according to Mr. Kerr, that should bind the Commission

16   in whatever they decide to do going forward.

17          So it's that in the unique posture that the

18   Younger issue comes up; and by the way, that sets this

19   case apart from every other Younger case that he has

20   mentioned err none where you already have the court

21   having jurisdiction over the constitutional issues, over

22   the same factual issues as in the other proceedings.

23          Secondly, Mr. Kerr says if you accept the

24   Post-Gazette's position that eliminates Younger's

25   doctrine whenever a party thinks they have a winning

 1    argument, they are going to simply present that argument
 2    and try and bypass the same procedure.  That's not the
 3    situation here at all.
 4           We are arguing that Younger doesn't apply
 5    because of the facts and circumstances of this case and
 6    particularly because of the constitutional arguments.
 7           Now, Mr. Kerr points out that many of the
 8    Younger precedents including *Dayton*, *Middlesex* and cases
 9    like that involve First Amendment issues but it requires
10    a more nuanced look and a more precise look at what
11    those First Amendment questions are.
12           This is not a case, as we pointed out in our
13    papers, where the Post-Gazette is arguing that it is not
14    subject to antidiscrimination law at all.  It's not
15    arguing as in many of these other cases for a blanket
16    immunity from all inquiry.  It's arguing that conducting
17    the investigation in a matter that focuses on editorial
18    standards raises a unique First Amendment problem by
19    which going through the state and local procedure is
20    going to be its own First Amendment infringement.
21           I think you can look at both the religion and
22    press cases to understand what kind of a nuance inquiry
23    is required and it comes up in both contexts.
24           In religion cases, the question is whether or
25    not the inquiry requires an examination of church

1   doctrine, not that the religious institutions are immune

2   absolutely from employment or antidiscrimination law.

3   It's just the nature of the inquiry.

4           So in *Dayton Schools*, there you are talking

5   about a standard employment question, whether or not the

6   church can simply claim that it's not subject to those

7   laws.  It is a First Amendment issue but it wasn't one

8   that required looking into matters of church doctrine.

9           The Third Circuit in *Curay-Cramer* explored the

10  distinction and went into an extended analysis of *NLRB*

11  *v. Catholic Bishops of Chicago* which explores these

12  issues, said it would present a problem to rule on the

13  relative similarity of offenses against a particular

14  church doctrine.  The Court went on to say, it is

15  difficult to imagine an area of employment relation less

16  fit for scrutiny by the secular courts.  In that case

17  the Court dismissed the claim that would have required

18  an investigation.

19          Now, in the press cases, different track from

20  the religion cases themselves but you have the same kind

21  of division between what kinds of First Amendment issues

22  may raise a concern for the state proceeding to go

23  forward than in others.  So if you are simply saying

24  that we are a newspaper, we are immune from any kind of

25  review by an employment agency or by an

anti-discrimination agency, then that kind of First
Amendment defense isn't going to give you a reason to
bypass the state procedure.  It is the nature of the
inquiry and so, for example, in the NLRB cases, we talk
about labor law.  When they talk about what kinds of
investigations where government interests are opposed,
it says, you can apply neutral economic regulations, you
can apply labor law to press agencies but you cannot
apply it in such a way that you look at the editorial
function.

Again, some of the same cases that we cited
when we were discussing the 1981 action are applicable
here.  *Newspaper Guild of Greater Philadelphia v. NLRB*,
protection of editorial integrity is within the First
Amendment zone of protection and, therefore, entitled to
special consideration.

*Ampersand Publishing v. NLRB and McDermott v.*
*Ampersand Publishing, and McClatchy Newspapers v.*
*Nelson,* all of those cases talk to when you are looking
at specifically the editorial function, that's where you
draw the line between what is an admissible inquiry and
what is not.

Your Honor, you had asked the question about
whether or not there was a different inquiry in this
administrative case as opposed to the Johnson case and

1    whether or not that raises different First Amendment

2    issues and that's where we come back to the ability to

3    apply and enforce editorial standards.

4             This case really comes back down to the denial

5    of someone's ability to pitch a story and others who

6    supported that reporter and the three questions posed by

7    the Commission are these:

8             Claims that the Post-Gazette disallowed an

9    African-American journalist to cover protests because of

10   tweets.

11            Secondly, that the paper subjected other

12   journalists who supported her to, quote, retaliation but

13   here by disallowing coverage or editing their stories.

14            Or third, disallowed a Pulitzer Prize winning

15   photographer from covering protests after tweeting

16   support hashtag.

17            Now, again, all of the supposed actions are

18   ones that involve the hard editorial judgment, whether

19   you allow the reporter to cover the riots after taking a

20   public position, whether you allow other reporters to

21   cover the riots after taking a public position, and the

22   same is true in the third question as well, they all

23   boil down to the editorial judgment.

24            What you might call that, if you wanted to use

25   a pejorative term retaliation, again, that comes down to

1    the kind of decisions that have been roped off in the

2    First Amendment cases in what is protected by the First

3    Amendment.

4             Now, Mr. Kerr said there is no limiting

5    principle to preserving Younger if you allow this case

6    to go forward.  I think it works the other way around.

7    There is absolutely no limiting principle on what PCHR

8    can deem to be an employment practice.

9             As I say at Page 1 of their motion to dismiss,

10   all personnel actions taken by newspapers concerning

11   their reporters are subject to their jurisdiction.  So

12   there is really no limit to what they can inquire on if

13   a worker at a newspaper takes issue with an editor.  It

14   could be they prefer their story appeared on page one

15   instead of page two.  It could be they think the editor

16   is being too hash in correcting their punctuation.  It

17   could be any personnel action that would be subject to

18   the PCHR's jurisdiction if you can allege that it was

19   motivated by discrimination.

20            There is simply no end to that, and that's why

21   allowing the proceeding to go forward by itself is the

22   violation, creates the First Amendment problem because

23   you can imagine no matter how many due process

24   procedures you have in place, the spectacle of trotting

25   in an entire newsroom staff and editors to explain their

editorial decisions, to explain their editorial policies

through an administrative procedure simply is going to

be the violation in and of itself as the Supreme Court

said in *Catholic Bishops*, the inquiry alone can be the

infringement.

That was the point that was made by the Fifth

Circuit in the *LA Debating Society* case that Mr. Kerr

mentioned and we tried to distinguish.

That was a proceeding where the local Human

Relations Commission bringing an action against private

clubs and abstention was denied in this case.

The argument was made that the Commission's

procedures were fully to protect the *LA Debating Society*

because after all, they could raise their objections in

front of a hearing, they would have full due process

proceedings, they could have review at the state level,

and the Fifth Circuit rejected those arguments by saying

the idea that you are going to have to have clubs

disclose their membership, to have their tax records and

all of that in order to defend this process would be a

violation in and of itself, and went on to deny Younger

abstention saying if those clubs must go public in order

to remain private, then their privacy rights ring hollow

indeed.  The flame is not worth the candle and echoed

the language from *NLRB v. Catholic Bishops*, the very

1   process of inquiry impinge on rights guaranteed by the

2   First Amendment point made in *Cramer* as well.

3         Mr. Kerr uses the expression you can't unring

4   that bell.  That's exactly what happens here if you have

5   a Human Relations Commission being able to conduct a

6   trial on whether or not the editorial decisions were

7   sound or in their case, nondiscriminatory.

8         Mr. Kerr says, well, let our process go

9   forward.  After all, we may find it's okay, but that is

10  the problem.  The problem is the notion that newspapers

11  can be called to account for purely editorial decisions,

12  run through months of discovery, run into a trial-type

13  hearing and have to justify why they edited a piece or

14  assigned a story the way they did, and that is the very

15  problem we are talking about and why we filed suit.

16        Now, originally, when we brought this case, we

17  went through the Commission's process, filed our

18  position paper and answer and hoped that when they saw

19  the full context of what happened, why this affects

20  editorial decisions, that we would be able to sit down

21  and have a conversation and decide whether or not the

22  case could be resolved at that point.

23        When we suggested we were hoping that would

24  lead to a dismissal of the action, that meeting was

25  canceled.  The PCHR was not interested in having that

1    discussion.  So it was only at that point that the

2    Post-Gazette went forward and filed the 1983 action.

3          As a consequence, we are all here today.  As I

4    mentioned at the outset, this is different from other

5    Younger cases, the abstention doctrine doesn't apply

6    here because of the fact there is an ongoing proceeding

7    covering the same issues, the same constitutional

8    questions, but I think, too, the decisions that have

9    been issued on Younger that have denied Younger

10   abstention certainly provide another reason why this

11   Court should deny the Younger doctrine here.

12         First of all, Mr. Kerr places great weight on

13   *Ocean Grove*.  I understand why he does so even though

14   it's not precedential.  It does not establish a bright

15   line.  That's one of the things to remember in the

16   abstention cases, they all apply a range of factors

17   because it is an equitable decision made by the Court to

18   determine whether or not abstention makes sense in this

19   case.

20         So I think when you take the fact that this is

21   a matter where the courts already have jurisdiction and

22   apply the other Younger factors, it underscores the

23   reason why abstention should be denied.  It's not a

24   bright line saying if the state agency has proceeded,

25   then we are at an end.

1          By the way, when Mr. Kerr was talking about
2     the way in which this proceeding began, that it was
3     simply the state agency deciding it was going to take
4     action because it was particularly concerned about the
5     situation, that means there was no opportunity, no
6     warning, no advance notice that would have allowed the
7     Post-Gazette to come to court first before the state
8     proceeding started, which sets a depart from cases like
9     *Telco Communications* and the LA, *Louisiana Debating and*
10    *Literary Society* case.  If that's the case, then local
11    governments can simply forestall review by state courts
12    by initiating a proceeding and saying see us in two
13    years, see us whenever, we are going through our process
14    and we can violate rights along the way.

15          Getting back to the Younger cases, there are a
16    number of them where matters are at an early stage in
17    the proceedings, as they are here, and courts have found
18    that abstention is not warranted.  By the way, many of
19    these are recognized in the most recent precedent from
20    the Third Circuit on this, the *PDX North* case which
21    cites a number of these with approval.  One of them is
22    the Seventh Circuit decision in *Mulholland v. Marion*
23    *County Election Board*, another is the case I just
24    mentioned a minute ago, the *Telko Communications v.*
25    *Carbaugh*.  They are all involving First Amendment issues

1    where the Courts said where you have a proceeding that

2    is at an early stage of proceedings that you are not

3    going to intrude too greatly on the local proceeding and

4    you have these weighty First Amendment issues,

5    abstention is not warranted.

6           The *PDX* case itself talks about how the

7    difference between where you have a proceeding that is

8    well established, well into the process compared to one

9    where it's really at its beginning.  That's not what

10   would be considered an ongoing state proceeding.  Again,

11   *PDX North*, it was a split decision where one party that

12   was subject to audits by the state tax and labor board

13   where abstention was granted and then another one that

14   was subject to an audit letter where abstention was

15   denied.

16          Mr. Kerr tries to distinguish that by saying

17   it was just an audit letter, but under New Jersey law,

18   the New Jersey Unemployment Compensation Act requires

19   employers to provide records to the auditor on

20   examination subject to judicial supervision.

21          It certainly could have been considered to be

22   an ongoing state proceeding, but the Third Circuit said

23   it wasn't far enough down the road to be considered an

24   ongoing state proceeding.

25          I think if you look at those cases cited with

1    approval by *PDX North*, you'll find this falls more in

2    line of that line of cases or those sort of cases where

3    the first *Middlesex* factor is not met.

4          As to the final *Middlesex* factor, those are

5    the ones I was talking about earlier typified by the *LA*

6    *Debating* and *Literary Society* case where going through

7    the proceeding itself is the violation and creates the

8    tension with the First Amendment.  So regardless of how

9    many well-intentioned due process protections are

10   provided, when you are allowing a state proceeding to go

11   forward where by its nature it is bringing in newspaper

12   editors and other reporters to justify what editorial

13   choices they have made, then that's precisely the kind

14   of administrative set of procedures that cannot protect

15   against the violation of the important constitutional

16   interests.

17          To sum up, this is not an argument either for

18   saying that Younger doesn't apply whenever you think you

19   have a winning case, no.  This is a really unique

20   situation which is why Mr. Kerr would not have found

21   hundreds or thousands of cases during his cursory

22   review, why he hasn't found more cases like this.  It's

23   really as unique as any case I have ever seen.

24          It's not a case where we are simply arguing

25   because this is a newspaper, employment law, not

 1   anti-discrimination law, doesn't apply.  No.  This is a

 2   case where a local government is seeking to inquire into

 3   the editorial processes of a newspaper creates a First

 4   Amendment problem that requires action by a federal

 5   court, and that's why we're here today.

 6              Thank you, Your Honor.

 7              THE COURT:  Thank you very much.

 8              Mr. Kerr, any final last words here.

 9              MR. KERR:  30 seconds, Your Honor.

10              With regard to Post-Gazette's First Amendment

11   defenses, I think they are very interesting.  We just

12   think they should be made at state court because that's

13   what our Constitution says, that's what federalism is.

14              With regard to the two cases he cited,

15   *Mulholland* and *Telco Communications v. Carbaugh*, I don't

16   want to sound sarcastic but the great bard's phrase,

17   hoisted up with his own petard comes to mind.  If you

18   read those cases, in *Mulholland*, the Court held that a

19   plain election board hearing was not an ongoing civil

20   proceeding so as to qualify for abstention because the

21   hearing board lacked authority to mete out any

22   meaningful sanctions.  Yet the Court cited *Dayton*

23   *Christian Schools*, a civil rights investigation as the

24   exact type of proceeding that has authority.

25              If you look at *Telco v. Carbaugh*, though the

1  abstention was at issue, the Court decided not to

2  abstain because no judicial proceeding had commenced.

3  The plaintiff had only received a letter listing

4  possible charges and an invitation to an informal

5  factfinding conference.

6          Then the Court cited *Middlesex* as the perfect

7  example when judicial proceedings had started.  In that

8  case, plaintiff received a final ethics charge which is

9  exactly tantamount to what happened here.  We received a

10  charge and the charge was answered.

11          So if you actually look at those cases, they

12  actually support our theory that we're pretty far down

13  the line.  We crossed the threshold as soon as the

14  complaint was filed.  We think Younger was met.

15          Again, I am not trying to poo-poo the First

16  Amendment argument.  It's very interesting.  They may

17  win but in our system of constitutional law, we should

18  respect the state courts and allow them to be voiced

19  there.

20          That's all.  Thank you, Judge.

21          THE COURT:  Thank you to both of you.  Thank

22  you to all counsel on well-argued motions, very

23  interesting issues.

24          Because of some of the complexities of these

25  issues, I'm obviously going to take both motions under

1   advisement.  I would also like to order a copy of this

2   transcript to be split, I suppose split three ways in

3   terms of the cost between each of the parties here and

4   then we'll have that transcript docketed in both of the

5   cases, but I think I would like to look at the

6   transcript for purposes of deciding the pending motions.

7   So with that, I appreciate everyone's time.

8           Is there anything further that needs to be

9   brought to my attention at this point in time?

10  Mr. Cordes, I'll start with you?

11          MR. CORDES:  No, Your Honor.

12          THE COURT:  Thank you.

13          Mr. Kerr?

14          MR. KERR:  No, Your Honor.  Thank you.

15          THE COURT:  Mr. Corn-Revere?

16          MR. CORN-REVERE:  Not from us, Your Honor.

17          THE COURT:  Thank you, everyone.

18          Have a good day.  Take care.

19          (Whereupon, the above hearing concluded at

20  1:00 p.m.)

21          I hereby certify by my original signature
    herein, that the foregoing is a correct transcript, to
22  the best of my ability, from the record of proceedings
    in the above-entitled matter.

23

24          S/ Karen M. Earley
            Karen M. Earley
25          Certified Realtime Reporter